Bernard WARTENBERG, Plaintiff,

v.

AETNA U.S. HEALTHCARE, INC., Defendant.

No. CIV.A. 97–CIV3536 (DGT).

United States District Court, E.D. New York.

April 13, 1998.

Mr. Bernard Wartenberg, Staten Island, NY, pro se.

Kenneth J. Kelly, Epstein, Becker & Green, P.C., New York City, for Defendant.

## MEMORANDUM AND ORDER

TRAGER, District Judge.

Bernard Wartenberg, plaintiff pro se, filed this suit against defendant Aetna U.S. Healthcare, Inc., for the wrongful death of plaintiff's aunt, Betty Lieberman, due to the alleged misconduct and negligence of defendant. The defendant has filed a motion to dismiss. For the reasons stated below, the defendant's motion is denied, and the case is remanded to the Civil Court of the City of New York because this court lacks jurisdiction over this action, and therefore, the removal was improper.[1]

### Background

Plaintiff is the nephew of Betty Lieberman, whom plaintiff alleges died as a result of misconduct and negligence on the part of Aetna U.S. Healthcare, Inc. ("AUSH"), a health maintenance organization ("HMO") permitted by the U.S. Department of Health and Human Services, Health Care Financing Administration ("HCFA"), to administer medicare benefits. Lieberman moved into her nephew's house when she was in her nineties and lived in his house for approximately seven years prior to the events which gave rise to this lawsuit. During this time, plaintiff took care of Lieberman and managed all of her affairs.

Plaintiff asserts that representatives of AUSH solicited plaintiff and Lieberman for an insurance policy while they were having dinner in a diner. According to plaintiff, promising to alleviate plaintiff's responsibility of managing his elderly aunt's medical affairs, these representatives painted a rosy picture of managed healthcare to plaintiff, who consented to allow AUSH to assume the responsibility of administering Ms. Lieberman's medicare reimbursements. As a result of this solicitation, Lieberman, a medicare beneficiary, enrolled in a medicare benefit plan administered by AUSH.

The complaint alleges that on the eve of Thanksgiving, 1996, Lieberman was admitted to a hospital emergency room due to a bout of extreme difficulty in breathing and a severe case of pneumonia. She remained in the hospital for six days. Before she recovered from these illnesses, and although she was in no condition to be discharged, Lieberman was discharged from the hospital to a nursing facility where she received skilled care. Lieberman's medicare benefit plan with AUSH entitled her to receive up to one hundred days of skilled care. However, within three days of Lieberman's admission

---

1. The removal was also untimely. Defendant AUSH removed this action to federal court well after the thirty day period from initial receipt of service had expired. *See* 28 U.S.C. § 1446(b).

to the skilled care facility, plaintiff was notified by AUSH that Lieberman was being discharged from the facility. AUSH gave plaintiff an ultimatum, either he removed his aunt from the facility immediately or he would be responsible for all future expenses. Lieberman was still extremely ill when she was discharged from the skilled care facility and returned to plaintiff's home. She remained in plaintiff's home for less than one week before being readmitted to the hospital in critical condition. In the hospital, Lieberman received tube feeding, continuous oxygen via mask, multiple intravenous antibiotics, and a catheter for urinary elimination. Despite her grave condition, Lieberman was once again discharged from the hospital, allegedly under AUSH's pressure, and readmitted to a skilled care facility. Within forty-eight hours, she was returned to the hospital in acute respiratory distress, where she was attached to a respirator and placed in the intensive care unit. Plaintiff claims that Lieberman could not endure recurrent admissions to and discharges from three hospitals and two nursing homes in fifty-five days, and she died on January 21, 1997.

Plaintiff alleges that AUSH caused Lieberman's death by transferring her from hospital to hospital, from facility to facility, and by making imprudent medical decisions on her behalf for the sole reason of saving money, and without regard to Lieberman's life-threatening condition. Plaintiff also alleges that, at a minimum, AUSH should have permitted Lieberman to stay in the skilled care facility for the full one hundred days upon her initial discharge from the hospital, as provided by the medicare plan between AUSH and Lieberman. In his ad damnum clause, plaintiff does not seek recovery of medicare benefits in his complaint. Rather, he seeks burial costs and punitive damages for Lieberman's death.

Plaintiff initially filed a summons with complaint with the Civil Court of the City of New York, on May 30, 1997. On June 11, 1997, AUSH filed an answer to the complaint and pled a general denial. On July 16, 1997, the defendant removed the action to the United States District Court for the Eastern District of New York, on the ground that the claims asserted in plaintiff's complaint are preempted by the Medicare Act, 42 U.S.C. § 1395 *et. seq.*, which governs the contract between defendant and plaintiff's decedent.

Once in federal court, AUSH moved to dismiss the complaint on three grounds. First, AUSH argues that since plaintiff's claims arise under and are preempted by the Medicare Act, plaintiff is required to exhaust his administrative remedies as provided under the Medicare and Social Security Acts before proceeding to federal court, and that his failure to do so deprives this court of subject matter jurisdiction. Second, AUSH argues that plaintiff lacks standing to sue, since he is attempting to assert rights belonging to the estate of his deceased aunt without having been appointed administrator or executor of Lieberman's estate. Third, AUSH argues that New York law requires a finding of actual damages before punitive damages may be awarded. Defendant argues that plaintiff's failure to plead actual damages in addition to punitive damages should bar his recovery.

**Discussion**

(1)

■ The initial and decisive issue to be resolved is whether the wrongful death, negligence and other state tort law claims alleged by plaintiff on behalf of his deceased aunt arise under and are, therefore, preempted by the Medicare Act. As previously mentioned, plaintiff is not seeking to recover medicare benefits, but rather is seeking damages based both on the HMO's conduct in wrongfully discharging his aunt from various hospitals and skilled care facilities, and on the HMO's improper denial of services which were promised by the HMO in the medicare plan with the plaintiff's aunt. If such claims are not preempted by the Medicare Act, then removal of this case from state court to federal court was not proper, and the action must be remanded to state court. However, if such claims are in fact preempted by the Medicare Act, plaintiff would need to first exhaust his administrative remedies, as provided under the Act, before judicial review would be proper. For the reasons set forth below, the court finds that plaintiff's claims

are not preempted by the Medicare Act, and since there is no other basis for jurisdiction in federal court, the action must be remanded to state court for further proceedings.

The Medicare Act (the "Act") appears in Part A of Title XVIII of the Social Security Act, 42 U.S.C. § 1395 *et. seq.* The Act provides insurance to eligible medicare beneficiaries for the cost of hospital and related post-hospital expenses. The Act also provides for the delegation of medicare benefit administration to HMOs which are authorized to manage medicare benefit requests by medicare beneficiaries, under contracts with the HCFA.

Section 405(g) of Title 42 provides that judicial review of old-age and disability claims may only occur after a "final decision" has been rendered on such claims. This provision is incorporated into the Medicare Act through 42 U.S.C. § 1395ff(b), and it applies equally to medicare benefits managed and administered by HMOs. The Secretary of Health and Human Services has promulgated regulations which provide that a "final decision" is rendered on a Medicare claim only after all the levels of administrative review have been exhausted.[2]

▮ Furthermore, the Supreme Court has made clear that 42 U.S.C. § 405(h),[3] made applicable to the Medicare Act by 42 U.S.C. § 1395ii, requires that judicial review of all claims arising under the Medicare Act must exactly follow the procedure described in 42 U.S.C. § 405(g). Thus, this provision acts as a limitation on the otherwise available federal-question jurisdiction. *See Heckler v.*

*Ringer,* 466 U.S. 602, 614–15, 104 S.Ct. 2013, 80 L.Ed.2d 622 (1984).

The threshold question is, therefore, whether plaintiff's claims arise under the Act, thus precluding judicial review of such claims before the exhaustion of all available administrative remedies, as provided by the Act. Defendant argues that at the core of plaintiff's complaint is a claim that the HMO failed to provide benefits to Lieberman, and that Lieberman died as a result of this failure. Defendant concludes that since the complaint sets forth state law causes of action which relate to providing or denying benefits under a medicare plan, they necessarily "arise" under the Medicare Act. *See* Memorandum of Law in Support of Defendant's Motion for Judgment on the Pleadings, pgs. 5–6. AUSH cites *Heckler v. Ringer* as support for these assertions, as well as for the proposition that the phrase "arising under" should be interpreted broadly. *See id.*

In *Heckler v. Ringer,* three plaintiffs were medicare beneficiaries who were denied reimbursement for bilateral carotid body resection surgery ("BCBR") that they had already undergone, because a formal ruling of the Secretary of Health and Human Services had concluded that BCBR was not a reimbursable medical procedure. 466 U.S. at 609–610. These three plaintiffs had exhausted some, but not all, levels of administrative review. A fourth plaintiff had not yet undergone BCBR since he could not afford it, but nevertheless sought to challenge the Secretary's formal ruling that BCBR was not a reimbursable medical procedure. *Id.* The district

---

2. The exclusive administrative appeals process applies to all benefit determinations. *See* 42 U.S.C.A. §§ 405(b), 1395mm(c)(5)(A); 42 C.F.R. § 417.606. All medicare claims must first be brought for reconsideration to the organization which made the initial determination and to HCFA. *See* 42 C.F.R. §§ 417.616, 417.620. If the dispute is not resolved favorably to the beneficiary, and if the amount in controversy exceeds $100, HCFA's decision may be appealed to an administrative law judge. *See* 42 C.F.R. §§ 417.630, 417.632. The decision may be further appealed to HCFA's Appeals Council, and if the amount in controversy exceeds $1,000, the beneficiary or dissatisfied party may seek the judicial review of the decision in federal court. 42 C.F.R. §§ 417.634, 417.636.

3. Section 405(h) provides:

The findings and decision of the ... [Secretary of Health and Human Services] after a hearing shall be binding upon all individuals who were parties to such hearing. No findings of fact or decision of the ... [Secretary of Health and Human Services] shall be reviewed by any person, tribunal, or governmental agency except as herein provided. No action against the United States, the ... [Secretary of Health and Human Services], or any officer or employee thereof shall be brought under section 1331 or 1346 of Title 28 to recover on any claim arising under this subchapter.

court dismissed the complaint for lack of jurisdiction, concluding that the essence of the plaintiffs' claim was a claim of entitlement to benefits for the BCBR procedure, and that any challenges plaintiffs raised concerning the Secretary's formal rulings or procedures were "inextricably intertwined" with a claim for benefits. Therefore, the district court concluded that 42 U.S.C. § 405(g) with its administrative exhaustion requirements provided the sole avenue for judicial review for these claims. *Id.* at 605, 608–609.

The Court of Appeals for the Ninth Circuit reversed, concluding that to the extent the plaintiffs were seeking to invalidate the Secretary's formal ruling which had deemed BCBR a non-reimbursable procedure, those claims were cognizable without any requirement of administrative exhaustion under the federal question and mandamus statutes, 28 U.S.C. § 1331 and 28 U.S.C. § 1361, respectively. *Id.* at 612.

The Supreme Court, agreeing with the district court, reversed the Court of Appeals and construed plaintiffs' claims as nothing more than, at bottom, a claim that they should be paid for their BCBR surgery. The Supreme Court also agreed with the district court's conclusion that plaintiffs' claims challenging the Secretary's formal ruling arose under the Act, because they were "inextricably intertwined" with claims for past or future medicare benefits sought. The Supreme Court further held that the "arising under" language in § 405(g) is to be read broadly as to include claims in which "both the standing and the substantive basis for the presentation of" the claims is the Act. *Heckler v. Ringer*, 466 U.S. at 615. Using this broad test, the Supreme Court concluded that the plaintiffs' claims arose under the Act, because the plaintiffs were challenging an interpretation of the scope and extent of benefits provided by the Medicare Act. *Id.*

Nothing in *Heckler v. Ringer*, however, compels a reading of the phrase "arising under" which would encompass all state law claims, especially when those claims do not seek a reimbursement of medicare benefits. First, the facts of *Heckler v. Ringer* are readily distinguishable from the instant case,

in that all the plaintiffs in *Heckler v. Ringer* were seeking reimbursement for past or future medical procedures. *See Heckler v. Ringer*, 466 U.S. at 609–610. In the instant case, plaintiff does not seek to be reimbursed for a past or future medical procedure. Rather, plaintiff seeks relief for state law torts which he alleges have been inflicted upon his aunt and which caused her conscious pain and suffering, and ultimately, her wrongful death.

Moreover, although the Supreme Court read the "arising under" language of the Act broadly, it also explicitly recognized that not all cases are appropriate for the initial exhaustion of the administrative remedies provided under the Act. *See Heckler v. Ringer*, 466 U.S. at 618. The Court noted that if a claim was wholly collateral to a claim for benefits, and if the plaintiff made a colorable showing that his injury could not be remedied by the retroactive payment of benefits, administrative remedies would not be appropriate for such a case. In this case, Lieberman's death certainly cannot be remedied by a retroactive authorization or payment of hospital and skilled care facility benefits. Furthermore, plaintiff's claims are collateral to a claim for benefits, since the standing of the plaintiff's claims is rooted in state law causes of action, and not the Medicare Act, as was the case in *Heckler*. Thus, the Supreme Court's analysis in *Heckler* does not answer the question presented by the instant case, namely, whether a plaintiff's state law claims against an HMO "arise under" the Medicare Act, when the plaintiff is not seeking to recover reimbursement for past or future medicare benefits, but is rather seeking to recover damages for the HMO's negligent or tortious acts.

(2)

A persuasive analysis of the issue presented in this case appears in another Ninth Circuit case, *Ardary v. Aetna Health Plans of Southern California, et. al.*, 98 F.3d 496 (9th Cir.1996), *cert. denied,—— U.S. ——*, 117 S.Ct. 2408, 138 L.Ed.2d 174 (1997), a case involving facts very similar to those in the instant case and the only federal one to

address squarely the issue to date.[4] In *Ardary*, the surviving husband and children of the decedent medicare beneficiary sued Aetna Health Plans of California ("Aetna"), their sales representative, and an affiliated doctor, for, among other claims, the wrongful death of the decedent. When the decedent suffered a heart attack, Aetna and its affiliated doctor failed to authorize her airlift transportation to a larger non-rural facility, despite prior representations that should the need arise, Aetna would immediately authorize the transfer of the decedent to a more sophisticated and larger facility. *See Ardary*, 98 F.3d at 496–498. Plaintiffs alleged that the decedent died due to Aetna's failure to authorize the airlift.

The Ninth Circuit determined that the complaint did not seek recovery of Medicare benefits, despite the fact that the plaintiffs conceded that their claims were "predicated on" the failure to authorize the airlift, an alleged benefit under the decedent's medicare plan. The court found that the plaintiffs' complaint did not include any claims where "both the standing and the substantive basis for the presentation" of the claims was the Act. *Ardary*, 98 F.3d at 499 (*citing Heckler v. Ringer*, 466 U.S. 602, 615, 104 S.Ct. 2013, 80 L.Ed.2d 622 (1984)). First, the court stated that the standing of general and punitive damages sought by the plaintiffs was based upon state common law theories, such as negligence and intentional or negligent infliction of emotional distress, and not the Act. *See Ardary*, 98 F.3d at 499–500. Second, the court held that, even though plaintiffs had conceded that their wrongful death complaint was predicated on the failure of Aetna and its doctor to authorize a benefit under the decedent's medicare policy, these state law claims were not "inextricably intertwined" with the denial of benefits because the plaintiffs, at bottom, were not seeking to recover benefits.

The Ninth Circuit's analysis is readily applied to the instant case. Plaintiff here seeks damages for tort claims, including conscious pain and suffering and wrongful death. These claims are rooted in state common law theories, not the Act. Furthermore, plaintiff is not seeking to recover medicare benefits on behalf of his deceased aunt, but rather, he is suing for damages stemming from her wrongful death, such as burial costs as well as her conscious pain and suffering, resulting from the defendant's alleged wrongful acts. Such a claim for damages cannot be said to be "inextricably intertwined" with a claim for benefits.

AUSH's argument to the contrary is based upon a faulty syllogism. AUSH contends that its appointment as an HMO authorized to administer medicare benefits arises under the Act, and further, that all of plaintiff's claims are linked to the medicare benefits plan between Lieberman and AUSH. Therefore, according to AUSH, all of plaintiff's claims arise under the Act. *See* Memorandum of Law in Support of Defendant's Motion for Judgment on the Pleadings, pgs. 7–8. Defendant's argument does not withstand close scrutiny for several reasons.

First, defendant misreads the "inextricably intertwined" test established by the Supreme Court in *Heckler v. Ringer*. The Supreme Court established that a claim "inextricably intertwined" *to a claim for reimbursement of medicare benefits* arises under the Act. *See Heckler v. Ringer*, 466 U.S. at 611–12, 614–16. Contrary to AUSH's argument, the Supreme Court did not hold that a claim which is "inextricably intertwined" *to a medicare benefit plan*, regardless of whether or not it is a claim for reimbursement of medicare benefits, arises under the Act. Under AUSH's expansive reading of the test, any claims by a medicare beneficiary against an HMO would arise under the Act, no matter how tenuous their connections are to a claim for reimbursement of medicare benefits.

Second, defendant mistakenly argues that all of plaintiff's claims against AUSH, including his state tort law claims [5], arise under the

---

4. Defendant did not cite *Ardary*, despite the fact that the Ninth Circuit opinion was decided on October 21, 1996, well before the defendant filed its motion papers with this court, on September 26, 1997.

5. Plaintiff asserts that on various occasions AUSH made imprudent decisions on Lieberman's behalf, resulting in her death. Whether an HMO can be held liable under New York law under these facts is far from clear. Several

Medicare Act, since AUSH and Lieberman had only a contractual relationship based on the medicare plan. However, this argument would lead to some anomalous results. For example, one can conceive of a situation where due to a bureaucratic lapse, an HMO continues to provide benefits for a person who had been dropped for one reason or another from the plan, for instance non-payment of premiums. The defendant's argument would lead to the paradoxical conclusion that the HMO would escape liability for state tort law claims brought by this beneficiary, even if the contract between the beneficiary and the HMO was no longer in effect. What defendant fails to recognize is that state tort law claims are not based on contractual relationships. Just as New York law would not exonerate a doctor from negligence because his or her fee has not been paid, it should not matter that an HMO's premiums had or had not been paid, if it is otherwise liable for tortious behavior toward a recipient of benefits. *See Warren's Negligence in the New York Courts* III–2C–82 @ 03[1] (1996). Whatever the merits of any possible legal theories against HMOs under New York law, it is evident that some of them clearly are not linked to the underlying medicare benefits plan.

### (3)

Defendant relies heavily on *Bodimetric Health Service, Inc. v. Aetna Life & Casualty*, 903 F.2d 480 (7th Cir.1990), *cert. denied*, 498 U.S. 1012, 111 S.Ct. 579, 112 L.Ed.2d 584 (1990). After reviewing *Bodimetric*, it is difficult to understand why it supports defendant's arguments or is applicable to the instant case. *See* Memorandum of Law in Support of Defendant's Motion for Judgment on the Pleadings, pages 7–8. *Bodimetric* is distinguishable from this case on its facts and its reasoning.

Bodimetric owned and operated home health agencies which provided in-home medical services. These home health agencies obtained medicare reimbursements for their services from Aetna Life, which acted as a fiscal intermediary on behalf of HCFA. Aetna Life initially provided reimbursement for most of Bodimetric's claims. However, HCFA criticized Aetna Life's performance as a fiscal intermediary in a contract performance evaluation. In order to enhance its contract performance evaluation by HCFA, Aetna Life began to regularly deny reimbursements and payments to Bodimetric for services it had already rendered, without regard to the underlying substance of the claims. Bodimetric alleged that, due to these arbitrary denials, it lost eight million dollars and was forced to cease its operations and close. Bodimetric sued Aetna Life in federal court on fraud and other state law tort theories.

The Seventh Circuit, affirming the district court's decision dismissing the complaint for lack of subject matter jurisdiction for failure to exhaust administrative remedies, determined that because denials of reimbursement for services already rendered lay at the core of Bodimetric's claims, Bodimetric was mainly seeking to recover these amounts through its lawsuit. Thus, according to the Seventh Circuit, Bodimetric's claim for damages was inextricably intertwined with a claim for medicare benefits, as opposed to being collateral to such a claim, and judicial review of the claims could only be obtained after all the administrative remedies had been exhausted. *Bodimetric*, 903 F.2d at 487. The Seventh Circuit reached this conclusion by relying upon and analyzing two Supreme Court decisions which questioned whether § 1395ff barred premature judicial review of medicare benefit claims before all administrative remedies have been exhausted. The Seventh Circuit noted that in *United States v. Erika*, 456

---

theories and potential causes of action have been developed in various state courts to hold HMOs liable for a failure to provide care that is medically necessary, resulting in the injury or death of a patient. For instance, tortious breach of contract claims have been upheld by courts where the patient died due to an HMO's refusal to extend services which were medically necessary and which were covered under the health care

benefit plan. Also, fraud, misrepresentation, breach of contract, negligence, vicarious liability, and breach of warranty claims have been alleged against HMOs, and in various cases, these claims have been successful. *See The Liability of Health Maintenance Organizations*, 218 N.Y.L.J., Number 1 (July 1997); Moore & Gaiser, *HMO Liability—Part II*, 218 N.Y.L.J., Number 25 (August 1997).

U.S. 201, 102 S.Ct. 1650, 72 L.Ed.2d 12 (1982), the Supreme Court held that " § 1395ff barred judicial review of a hearing officer's 'amount of benefits' determination under Part B of the Medicare Act." *Bodimetric,* 903 F.2d at 484. However, in *Bowen v. Michigan Academy of Family Physicians,* 476 U.S. 667, 106 S.Ct. 2133, 90 L.Ed.2d 623 (1986), the Supreme Court held that " § 1395ff ... [did] not bar judicial review of claimant challenges to the validity of the administrative regulations promulgated under the ... Act." *Id.* The Seventh Circuit reconciled these two cases by concluding that challenges to the amount of medicare benefits to be paid (substantive claims) were not reviewable, whereas claims against the regulatory scheme under which the amount of benefits was determined (procedural claims) were reviewable. *Bodimetric,* 903 F.2d at 485. The Seventh Circuit eventually decided *Bodimetric* on the ground that Bodimetric's claims were more similar to the claims in *Erika* than to those in *Michigan Academy,* and, therefore, judicial review of Bodimetric's claims was precluded. Unlike Bodimetric, plaintiff in the instant case is seeking neither payment for covered services or reimbursement for medical services which were already provided. Consequently, the legal analysis in *Bodimetric* is inapplicable to the instant case, since it was based on the assumption that Bodimetric's claims were nothing more than claims for reimbursement of medicare benefits.

### (4)

 There are several additional considerations to support the conclusion here. The most important is federalism. Unlike the situation with ERISA, which has two provisions explicitly addressing the issue of preemption, the Medicare Act does not speak to the preemption issue at all, in the context of issues presented in the instant case. When there is no clear guidance from either Congress or the Supreme Court, there should be a strong presumption that Congress did not intend the Act to preempt all state causes of action for all cases which may relate to a claim for medicare benefits. *See Ardary,* 98 F.3d at 500–501. The reason is that preemp-

tion would seriously infringe upon strong state interests in regulating the quality medical care provided to its citizens.

Additionally, the legislative history of the Act does not suggest that state causes of action against an HMO for its tortious conduct are preempted by the Act. Rather, the legislative history of the Act indicates that the administrative remedies and specific judicial review procedures were established for "quite minor matters," such as amount determinations of specific medicare benefits. *Ardary* at 500–501, *quoting* 118 Cong.Rec. 33992 (1972) (remarks of Sen. Bennett).

Moreover, depriving medicare beneficiaries of possible state law remedies against medicare benefit administrators or providers would cause substantial inequity by precluding these beneficiaries, in many instances, from receiving damages for the wrongs which have been committed against them. Finally, the administrative agency in charge of applying the administrative procedure set forth in the Act does not possess the authority to assess the validity or merit of tortious claims, or to grant relief for these types of state law causes of action. Even if it had the authority, as a practical matter, it is evident that it is not presently equipped to handle these types of claims.

### *Conclusion*

■ Based on the foregoing analysis, the conclusion is that state law causes of action neither arise under, nor are they preempted by the Medicare Act, where the claims are not based on a request or claim for payment of benefits or for reimbursement, but rather on the tortious acts of a medicare benefit administrator. Since these claims do not arise under the Act, removal of this action from state court to federal court was improper. Accordingly, the case is remanded to state court for further proceedings.[6]

SO ORDERED:

---

6. Since the lack of jurisdiction requires remand to state court, it is not necessary to deal with

AUSH's arguments concerning plaintiff's lack of standing to sue and plaintiff's alleged failure to plead actual damages. Nonetheless, because plaintiff is pro se, it is appropriate to provide him with some guidance, especially because defendant's improper removal has left him little time to correct certain procedural errors in his case. AUSH's first argument that plaintiff lacks standing to sue, if it exists, is easily curable. Plaintiff still has time to seek appointment as representative of Lieberman's estate and may then amend his state complaint or file a new complaint as administrator of Lieberman's estate. Furthermore, AUSH's other argument for dismissal is also erroneous, since plaintiff did plead actual damages as funeral expenses are recoverable damages. Moreover, plaintiff seems to be seeking damages for his aunt's conscious pain and suffering as well as his aunt's wrongful death. The fact that plaintiff used the wrong label to express his damage claims should not bar recovery. As previously mentioned, plaintiff is a pro se litigant and, as such, a more liberal standard should be employed to construe his pleadings. Finally, EPTL § 5–4.3(a) provides that punitive damages may be awarded in wrongful death actions as long as the decedent could have recovered punitive damages had she survived. Therefore, aside from whatever actual damages that he is seeking, under New York law, plaintiff can in an appropriate case recover punitive damages in a wrongful death action.