**Dr. Jorge ZAMORA–QUEZADA, M.D., Dr. Martin Guerrero, M.D., and Their Named and Unnamed Patients and Survivors of Patients, Plaintiffs,**

v.

**HEALTHTEXAS MEDICAL GROUP OF SAN ANTONIO, Primary Carenet of Texas, L.L.C., Humana Health Plans of Texas, Humana Gold Plus, Pacificare of Texas and Secure Horizons, Defendants.**

No. Civ.A. SA–97–CA–726–FB.

United States District Court,
W.D. Texas,
San Antonio Division.

Nov. 30, 1998.

Hiser, Advocacy, Inc., Austin, TX, Randall C. Jackson, Jr., The Jackson Law Firm, San Antonio, TX, Robert J. Provan, Provan & Associates, Austin, TX, Donald P. Wilcox, Texas Medical Association, Austin, TX, for Jorge Zamora–Quezada, M.D., Martin Guerrero, M.D.

Peter James Stanton, Law Offices of Peter J. Stanton, San Antonio, TX, Deborah C. Hiser, Advocacy, Inc., Austin, TX, Robert J. Provan, Provan & Associates, Austin, TX, Donald P. Wilcox, Texas Medical Ass'n, Austin, TX, for Arthur Barrientes, Rita Barrientes, Joe Albert Garcia, Teresa Riojas Garcia, Ardelia J. Herrera, Eugene Herrera, Dianna Barron Lopez, Kimberlee Marshall, Raymond B. Mendiola, Juanita Vera Mendiola, Olga R. Murray.

Deborah C. Hiser, Advocacy, Inc., Austin, TX, Robert J. Provan, Provan & Associates, Austin, TX, Donald P. Wilcox, Texas Medical Ass'n, Austin, TX, for Norma Martinez, Maria Campos.

John Joseph Franco, Jr., Jenkens & Gilchrist Groce, San Antonio, TX, Rebecca Jo Reser, Lawrence D. Smith, Jenkens & Gilchrist, San Antonio, TX, for HealthTexas Medical Group of San Antonio, Primary Care net of Texas, L.L.C.

Bruce Edwin Anderson, Brin & Brin, San Antonio, TX, for Humana Health Plans of Texas, Inc.

Bruce Edwin Anderson, Brin & Brin, San Antonio, TX, John Joseph Franco, Jr., Jenkens & Gilchrist Groce, San Antonio, TX, for Humana Gold Plus.

Andrew Scott Hanen, Hanen, Alexander, Johnson & Spalding, L.L.P., Houston, TX, for Pacificare of Texas, Secure Horizons.

## ORDER GRANTING IN PART AND DENYING IN PART CONSOLIDATED MOTION TO DISMISS OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT

BIERY, District Judge.

David M. Adkisson, Law Offices of David M. Adkisson, San Antonio, TX, Deborah C.

### PROLOGUE

The cycles of health and disease and life and death have been extant on this small

planet at least since the Cambrian Era six hundred million years ago. The context of this case is the recent blink of the past seventy-five years of health care in the United States.

In a more simple time, Dr. James Clarence Mudd of Springfield, Kentucky, assisted by his granddaughters opening farm gates, ministered to the sick and wounded.[1] Dr. Joaquin Gonzalez of San Antonio, Texas, made house calls to patients, using his wife's vintage handbag to carry tools of his profession until he could afford a proper physician's valise.[2] Exercising their medical arts, and often compensated with poultry and produce, the bedside manner was no doubt excellent but infant mortality was high, polio crippled, life spans were short and medical technology incipient. Some would say the good old days were not all that good.

In the mid to late twentieth century, an amendment to the social contract evolved resulting in the chickens and vegetables being replaced with pictures of George Washington and Abraham Lincoln sent by public and private third-party payors.[3] Physician incomes rose exponentially.[4] The infusion of capital enabled medical science to augment medical art to delay death—even though nature still bats last.

The professional heirs of Drs. Mudd and Gonzalez are now often corporate employees caught between ancient Hippocratic devotion to patients and social policy questions of allocation of resources, and between historic vows of service when health care was the domain of religious and charitable institutions and modern business organizations owing allegiance to stockholders.

The reasonable balance sought by people of goodwill to the challenge of fairly and efficiently sharing the blessings of better health and longevity for the most part must be struck in the market place and in the political laboratories of the elected legislative and executive branches. The Americans with Disabilities Act and the Rehabilitation Act are two of those experiments in the democratic process.[5] The physician and patient plaintiffs invoke those statutes in the judicial branch seeking redress for alleged grievances against Humana Gold Plus and other defendants. Plaintiffs basically contend a modern version of the Golden Rule is being wrongfully applied by defendants: They who have the gold rule. Defendants deny any unjust conduct.

## LITIGATION BACKGROUND

Two physicians and thirteen patients allege the defendant health care entities created a contractual arrangement which results in discrimination against the disabled, subjecting defendants to injunctive relief under the Americans with Disabilities Act ("ADA"), compensatory and punitive damages under section 504 of the Rehabilitation Act ("Rehabilitation Act") and liability under various state law causes of action. Plaintiffs maintain the financial arrangement between and among the payors and the medical providers

---

1. See generally Dr. J.C. Mudd Died Suddenly Saturday Night, SPRINGFIELD KY.NEWS, Dec. 3, 1945.

2. See generally The Medical News, (Bexar County Med. Soc'y, San Antonio, TX), May 1978, at 7; Sept.1979, at 3.

3. See Jonathan B. Oberlander, Managed Care and Medicare Reform, 22 J. Health Pol., Pol'y & L. 595, 597 (1997) (although medical profession opposed Medicare, prepaid group plans and HMO coverage as introduced in the post World War II era, opinions seemed to change when monthly payments began being made). Court research can find no instances of U.S. physicians who do not take payments from insurance companies or government sources.

4. Compare physician incomes, which rose from an average of $13,432 in 1951, to $195,500 in 1995, see Phillip L. Burnstein & Jerry Cromwell,

Relative Incomes and Rates of Return for U.S. Physicians, 4 J. HEALTH & ECON. 64, 65 (1985) (1951 through 1980); AMA CENTER FOR HEALTH POLICY RESEARCH, SOCIOECONOMIC CHARACTERISTICS OF MEDICAL PRACTICE 1988 (Martin L. Gonzalez & David W. Emmons eds., 1988) (1978 through 1987); AMA CENTER FOR HEALTH POLICY RESEARCH, SOCIOECONOMIC CHARACTERISTICS OF MEDICAL PRACTICE 1997 (Martin L. Gonzalez ed., 1997) (1985 through 1995), with the annual minimum wage, which rose from $1,500 to $8,500 during this same time period. See 29 U.S.C. § 206 (including Historical and Statutory Notes).

5. 42 U.S.C. § 12101 et seq. (Americans with Disabilities Act); Pub.L. No. 93–112, § 504, 87 Stat. 355, 394 (codified as amended at 29 U.S.C. § 794) (Rehabilitation Act).

creates cost-cutting incentives to delay or deny professional treatment and services in an effort to force higher-cost disabled patients to go elsewhere. The two physician plaintiffs also contend their employment was terminated as a result of advocating for their patients and giving care which infringed on this contractual arrangement.

Humana Gold Plus, Humana Health Plans of Texas (collectively referred to as "Humana" or "Humana defendants"), PacifiCare of Texas ("PacifiCare") and Secure Horizons are health maintenance organizations, or HMOs, which provide medical benefits to their enrollees. HealthTexas Medical Group of San Antonio, Inc. ("HealthTexas") is a group of physicians who contract with HMOs to provide medical care to the enrollees of the HMOs. Primary CareNet of Texas, L.L.C. ("Primary CareNet") is an administrative company which negotiates the contracts between HealthTexas and the HMOs, charging HealthTexas a fee for providing administrative services, such as issuing physician payroll checks. Some plaintiffs are enrolled with Humana; others are enrolled with PacifiCare or Secure Horizons. All plaintiffs who are patients were receiving treatment at HealthTexas. Drs. Zamora and Guerrero were physician employees of HealthTexas.

The Humana defendants move to dismiss or alternatively for summary judgment on their enrollees' ADA and Rehabilitation Act causes of action. The Humana defendants contend: (1) the Court has no jurisdiction because plaintiffs failed to exhaust their administrative remedies under the Medicare Act; (2) plaintiffs lack standing to sue under the ADA and Rehabilitation Act; (3) plaintiffs have not pleaded and cannot maintain viable causes of action under the ADA and Rehabilitation Act; (4) summary judgment should be granted in the Humana defendants' favor as to the individual enrollees. HealthTexas and Primary CareNet move for summary judgment as to enrollee Olga Murray's claims.[6]

## APPLICABLE STANDARDS OF REVIEW

Motions to dismiss function to test the formal sufficiency of a complaint against the pleading requirements of the federal rules. In analyzing a defendant's request for dismissal, the court must accept the allegations in plaintiff's complaint as true and construe them in a light most favorable to the plaintiff. *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). To qualify for dismissal, it must appear to a certainty from the pleadings a plaintiff can prove no set of facts in support of claims for relief. *Id.* When matters outside the pleadings are considered, the motion to dismiss is converted to a motion for summary judgment.[7] Summary judgment is appropriate if no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. FED.R.CIV.P. 56. A fact is "material" if its resolution in favor of one party might affect the outcome of the suit under governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). An issue is "genuine" if the evidence is sufficient for a reasonable jury to return a verdict for the nonmoving party. *Id.* The moving party bears the burden of informing the court of the basis for its belief there is an absence of genuine issue for trial and for identifying those portions of the record which demonstrate such absence. *Matsushita Elec. Ind. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Leonard v. Dixie Well Serv. & Supply, Inc.*, 828 F.2d 291, 294 (5th Cir.

---

**6.** The motion by HealthTexas and Primary CareNet to Strike Plaintiff Olga Murray's Rebuttal of Defendants' Reply to Plaintiffs' Opposition to Defendants' Motion for Summary Judgment (docket no. 72) is denied. Defendants PacifiCare and Secure Horizons have not moved for dismissal or summary judgment and are not part of the consolidated motion.

**7.** In orders of administrative action (docket nos. 98 & 120), the Court informed the parties of its intention to convert defendants' motions into a consolidated motion to dismiss or, in the alternative, for summary judgment. The parties had an opportunity to present further briefing and present additional evidence. *See Nowlin v. Resolution Trust Corp.*, 33 F.3d 498, 504 (5th Cir.1994) (Court must give parties notice of conversion and provide opportunity to be heard and present further materials in support of their positions).

1987). When the moving party has met its burden, the nonmovant "must do more than simply show that there is some metaphysical doubt as to the material facts," it must come forward with "specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Ind. Co.,* 475 U.S. at 586–87, 106 S.Ct. 1348 (quoting FED.R.CIV.P. 56(e)).

## PLAINTIFFS' ALLEGATIONS OF DISCRIMINATION

Plaintiffs allege the drive to place cost containment above patient welfare led defendants to discriminate against disabled patients and physicians in relationship with them in violation of the ADA and the Rehabilitation Act. Plaintiffs Arthur Barrientes, Rita V. Barrientes, Raymond B. Mendiola, Juanita Vira Mendiola and Eugene Herrera received treatment at HealthTexas through their enrollment in Humana health plans and were assigned to Dr. Zamora as their treating physician. These enrollees allege the Humana defendants delayed or denied them full and equal enjoyment of medical treatment and services in violation of the ADA, 42 U.S.C. § 12182(a)[8], and limited or denied medical treatment and services in violation of section 504 the Rehabilitation Act, 29 U.S.C. § 794[9]. Humana moves to dismiss or for summary judgment on these discrimination causes of action.

Plaintiff Olga Murray received treatment at HealthTexas through her enrollment with Ethix Life Insurance and was also assigned to Dr. Zamora. She alleges HealthTexas and Primary CareNet violated the ADA and Rehabilitation Act by refusing to tell her where Dr. Zamora had gone after he left the employ of HealthTexas.[10] HealthTexas and Primary CareNet move for summary judgment on Ms. Murray's claims.

## LACK OF JURISDICTION FOR FAILURE TO EXHAUST ADMINISTRATIVE REMEDIES

 Humana argues jurisdiction is lacking because the plaintiffs who are patients failed to exhaust administrative remedies under the Medicare Act before filing suit. Plaintiffs maintain they do not seek benefit damages under the Medicare Act, but discrimination relief under the ADA and Rehabilitation Act, and therefore exhaustion is not a prerequisite to bringing suit. Section 1395mm(c)(5)(B) of the Medicare Act provides in relevant part:

> A member enrolled with an eligible organization under this section who is dissatisfied by reason of his failure to receive any health service to which he believes he is entitled and at no greater charge than he believes he is required to pay is entitled, if the amount of the controversy is $100 or more, to a hearing before the Secretary to the same extent as is provided in section 405(b) of this title. . . .

42 U.S.C. § 1395mm(c)(5)(B). This administrative procedure applies only to benefits determinations and claims "arising under" the Medicare Act. *Heckler v. Ringer,* 466 U.S. 602, 614–15, 104 S.Ct. 2013, 80 L.Ed.2d 622 (1984). Claims arising under the Medicare Act are claims in which "both the standing and the substantive basis for the presentation" of the claims is the Medicare Act. *Id.* at 615, 104 S.Ct. 2013 (quoting *Weinberger v. Salfi,* 422 U.S. 749, 760–61, 95 S.Ct. 2457, 45 L.Ed.2d 522 (1975)). The amended complaint reveals plaintiffs are not seeking Medicare benefits. The standing and the substantive basis for their claims is not the Medicare

---

**8.** Under the ADA:
No individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation.
42 U.S.C. § 12182(a).

**9.** Under the Rehabilitation Act:
No otherwise qualified individual with a disability . . . shall, solely by reason of her or his disabil-

ity, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance. . . .
29 U.S.C. § 794(a).

**10.** Plaintiff brought additional claims against defendants in her amended complaint. In response to defendants' motion, however, she advises she no longer intends to pursue these theories of recovery.

Act. Instead, plaintiffs allege defendants engaged in a practice of discouraging the disabled from seeking treatment in violation of the ADA and Rehabilitation Act. These theories have their genesis in illegal discrimination and are not related to the furnishing of Medicare benefits while plaintiffs were enrolled with Humana.

*Ardary v. Aetna Health Plans of California, Inc.,* 98 F.3d 496 (9th Cir.1996), *cert. denied,* 520 U.S. 1251, 117 S.Ct. 2408, 138 L.Ed.2d 174 (1997), is instructive. Plaintiffs brought suit against a Medicare HMO under several state common law theories for, among other things, misrepresenting its Medicare plan to enrollees. *Id.* at 498. Defendant argued the administrative process provided for in the Medicare Act was plaintiffs' sole "remedy." The court disagreed plaintiffs were seeking to recover Medicare benefits and found their state law claims did not "arise under" the Medicare Act. *Id.* at 499–501. Therefore, the administrative appeals process contained in the Medicare Act was not a prerequisite to filing suit:

> Because the instant state law claims do not "arise under" the Act, we hold that the exclusive administrative appeals outlined for resolution of benefit determinations do not preempt the Ardary's complaint.

*Id.* at 501. The court also noted plaintiffs' injuries could not be "remedied" by the retrospective authorization or payment of benefits, even if plaintiffs had exhausted the administrative remedies contained in the Medicare Act. *Id.* at 500. Although plaintiffs' seek federal rather than state relief, the same reasoning applies here.

■ Moreover, an exhaustion of the administrative remedy requirement would eviscerate the Rehabilitation Act. Section 504 of the Act applies to recipients of federal financial assistance. 29 U.S.C. § 794(a). The Humana defendants' health care system known as Humana Gold Plus, as a Medicare HMO, receives Medicare funds, making all their operations subject to section 504. *See United States v. Baylor Univ. Med. Ctr.,* 736 F.2d 1039, 1042 (5th Cir.1984) (Medicare and Medicaid are federal financial assistance for purposes of section 504); *see also* 29 U.S.C. §§ 794(b)(3)(A)(i), –794(b)(4) (for purposes of

Rehabilitation Act, program which receives federal assistance is defined as "all the operations of ... an entire corporation, partnership, or other private organization ... which is principally engaged in the business of providing ... health care ... any part of which is extended Federal financial assistance."). The Rehabilitation Act by its explicit language bars discrimination against any person with a disability who is a participant in a federally assisted program, 29 U.S.C. § 794(a), not only direct beneficiaries of federal financial assistance. The Fifth Circuit quoted a House Committee report which demonstrates, once section 504 is triggered by the receipt of federal financial assistance, the law protects all patients, not just Medicare beneficiaries, against discrimination:

> The Committee wishes to reaffirm that health care facilities and other providers that receive Medicare and Medicaid funds are required, under existing statutes and long-standing Department of Health and Human Services regulations and interpretations, to provide services without discrimination not just to Medicare and Medicaid beneficiaries, but to all patients.

736 F.2d at 1045–46 (quoting H.R.Rep. No. 98–442, 98th Cong., 1st Sess. 77 (Oct. 26, 1983)). To engraft the exhaustion requirement on plaintiffs' Rehabilitation Act cause of action would lead to the implausible result of a person in a Medicare HMO being required to exhaust administrative remedies before being able to file suit, while a person in a commercial HMO would not. As indicated by the Fifth Circuit in the *Baylor* case, Congress did not intend this result when it adopted the Rehabilitation Act. *See id.* This Court declines the opportunity to adopt such an impediment in the absence of clear congressional authorization. Humana's request for dismissal or summary judgment based upon the failure to exhaust administrative remedies under the Medicare Act is denied.

## STANDING

■ The Humana defendants contend plaintiffs have no standing to seek injunctive relief under the ADA because the enrollees: (1) have no right to seek monetary relief; (2) cannot prove "a likelihood of immediate or

substantial risk of any alleged discrimination in the future"; and (3) are not all Humana enrollees. While plaintiffs concede they are not entitled to monetary damages under the ADA, they have sought such damages under section 504 of the Rehabilitation Act. 29 U.S.C. § 794(a) (creating private right of action for individuals who have been subjected to illegal disability-based discrimination); see *also United States v. Forest Dale, Inc.*, 818 F.Supp. 954, 970 (N.D.Tex.1993) (monetary damages recoverable under section 504 of Rehabilitation Act). As to a reasonable expectation discrimination will reoccur in the future, Humana contends: "the financial incentives or controls which Plaintiffs allege resulted in discriminatory conduct are no longer in place" and therefore no actual case or controversy exists. In support of their argument, defendants state by affidavit: "the financial incentive [put in place since the filing of this lawsuit] differ from the current agreement.... [The Humana defendants] have no intentions to enter into the same or similar agreements as they existed prior to August 1996."

■ In response, plaintiffs direct the Court's attention to an August 8, 1996, Letter of Agreement between HealthTexas and Humana. It contains provisions for cost-sharing between these entities, including an "Allocation of Institutional Service Fund Surplus or Collection of Deficit," providing Medicare surpluses or deficits will be shared "50% HUMANA and 50% PROVIDER" if $17 per patient per month or less, and "40% HUMANA and 60% PROVIDER" if over $17. Plaintiffs allege this current agreement is the precise type of contractual agreement which has been the vehicle of discrimination against them. Plaintiffs also point to the Physician's Administration Manual, which according to defendants is currently in use. Chapter 16 of this document outlines the Reimbursement Scheme for the Humana defendants and contains a flow chart which shows how surpluses and deficits in Humana's various funds can result in either penalties or bonuses to HealthTexas. According to plaintiffs, these funds are linked to the goals of reduced medical care and cost reduction. The summary judgment evidence raises at least a fact question of whether the recurrence of alleged

illegal conduct and injury to plaintiffs is likely. Additionally, it is defendants' burden to demonstrate there is no reasonable expectation the wrong will be repeated. *United States v. W.T. Grant Co.*, 345 U.S. 629, 633, 73 S.Ct. 894, 97 L.Ed. 1303 (1953). Defendants' affidavit, untested by cross examination, made by an interested witness does not sustain the burden.

■ Concerning defendants' observation not all plaintiffs are Humana enrollees, plaintiffs state they make no claim for injunctive relief against Humana as to the non-Humana enrollees. Of the remaining plaintiffs who are patients, five were Humana enrollees at the time these causes of action accrued: Arthur and Rita Barrientes, Juanita and Raymond Mendiola and Eugene Herrera; two, Mr. and Mrs. Barrientes, still are. As injunctive relief survives discontinuance of the illegal conduct, an argument can be made injunctive relief is properly sought as to all five of the original Humana enrollees. *See id.* (injunctive relief survives discontinuance of illegal conduct in absence of proof by defendant there is no reasonable expectation the wrong will be repeated); *United States v. Oregon State Med. Soc'y*, 343 U.S. 326, 333, 72 S.Ct. 690, 96 L.Ed. 978 (1952) (sole function of injunctive relief is to forestall future violations). In any event, the record reflects two of the plaintiffs remain Humana enrollees. As long as even one plaintiff has a personal stake in the outcome of the case, standing exists to seek injunctive relief. *See W.T. Grant Co.*, 345 U.S. at 633, 73 S.Ct. 894 (injunctive relief properly sought where "movant is in danger of recurrent violation"). The Humana defendants motion to dismiss or for summary judgment based upon plaintiffs' alleged lack of standing to seek injunctive relief is denied.

## FAILURE TO STATE A CLAIM

The Humana defendants next contend plaintiffs cannot state a cause of action under the ADA or the Rehabilitation Act. Defendants argue: (1) they are entitled to a safe harbor under the ADA; (2) the Humana defendants do not exercise the requisite control over HealthTexas for liability purposes

under the ADA; (3) plaintiffs have not properly pleaded their federal discrimination case under the Texas Medical Practices Act; (4) plaintiffs cannot sustain a state law joint venture theory of recovery; and (5) the amended complaint does not allege violations of the ADA or the Rehabilitation Act.[11] As to whether plaintiffs have adequately pleaded a case for disability-based discrimination which was caused by the contractual arrangements between HealthTexas and the Humana defendants, a defendant carries a heavy burden when seeking to prove a case should be dismissed for failure to state a claim.

A motion to dismiss for failure to state a claim is disfavored and rarely granted. *Kaiser Alum. & Chem. Sales v. Avondale Shipyards, Inc.,* 677 F.2d 1045, 1050 (5th Cir.1982), *cert. denied,* 459 U.S. 1105, 103 S.Ct. 729, 74 L.Ed.2d 953, (1983). Two principles guide the review of the complaint sought to be dismissed. First, all well-pleaded facts in the complaint must be accepted as true, and "the complaint is to be liberally construed in favor of the plaintiff." *Id.* Second, the complaint should not be dismissed, for failure to state a claim, "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim that would entitle him to relief." *Id.* Conclusory allegations will not be accepted as true, and a complaint may be dismissed for failure to state a claim if relief is based on an affirmative defense. . . .

**11.** Plaintiffs contend the dismissal request should be denied as moot because it is based on plaintiffs' first amended complaint and plaintiffs were allowed to file a second amended complaint after the motion was filed. Because briefing on these issues continued after plaintiffs were allowed to amend, the motion will be addressed in light of the second amended complaint.

**12.** The second amended complaint states: "The pleadings, allegations and factual recitations from Plaintiffs' First Amended Complaint are incorporated in their entirety into this pleading in accordance with FRCP 10(C). By incorporation, this Second Amended Complaint includes the itemized list, by each Patient Plaintiff, of intentional discrimination by act and omission included in the First Amended Complaint." The second amended complaint further avers if the pleadings conflict, plaintiffs intend the second amended complaint should control.

*Cortez v. National Basketball Ass'n,* 960 F.Supp. 113, 114 (W.D.Tex.1997).

 The second amended complaint alleges numerous incidents where plaintiffs say they were forced to wait for long periods of time and delayed or denied medical care. Plaintiffs aver specific instances of non-disabled patients not having to wait for hours and receiving better treatment.[12] The amended complaint alleges the financial arrangement makes the disabled more costly to clinics leading to discrimination designed to force these higher-cost patients to obtain medical services elsewhere. Dr. Zamora and Dr. Guerrero allege their employment terminations were directly related to their advocacy for their disabled patients. It does not appear beyond a doubt plaintiffs can prove no set of facts in support of their claims of discrimination under the ADA and Rehabilitation Act which would entitle them to relief. *See John Doe v. Hillsboro Indep. Sch. Dist.,* 81 F.3d 1395, 1401 (5th Cir.1996) (district court must not dismiss complaint unless it appears beyond doubt plaintiff cannot prove facts in support of claim entitling him to relief).

 The Humana defendants next raise an affirmative defense to plaintiff's ADA allegations, contending they are protected from liability because of engagement in underwriting and risk classification pursuant to the safe harbor provision of the ADA. The safe harbor provision protects an insurer engaged in "underwriting" and "classifying risks."[13] Although the Act does not define

**13.** Section 12201(c) of the ADA states:
> Subchapters I through III of this chapter and title IV of this Act shall not be construed to prohibit or restrict—
> (1) an insurer, hospital or medical service company, health maintenance organization, or any agent, or entity that administers benefit plans, or similar organizations from the underwriting risks, classifying risks, or administering such risks that are based on or not inconsistent with State law;
> (2) a person or organization covered by this chapter from establishing, sponsoring, observing or administering the terms of a bona fide benefit plan that are based on underwriting risks, classifying risks, or administering such risks that are based on or not inconsistent with State law; or
> (3) a person or organization covered by this chapter from establishing, sponsoring, observ-

these terms, underwriting generally refers to the application of the various risk factors or risk classes to a particular individual or group for the purposes of determining whether to provide coverage. *See* EEOC: INTERIM GUIDANCE ON APPLICATION OF ADA TO HEALTH INSURANCE 11–14 (June 8, 1993). Risk classification refers to the identification of risk factors and the groupings of those factors which pose similar risks. *Id.* The Humana defendants maintain all payment and/or utilization review decisions made with regard to its enrollees at HealthTexas are based on actuarial, statistical and empirical data in the context of an individual treatment decision for an individual patient. Humana claims exemption from the ADA alleging the safe harbor protects the underwriting or risk classification in which Humana Gold Plus, a Medicare HMO, is engaged.

 Medicare statutes and regulations, however, prohibit a Medicare HMO from engaging in any medical underwriting; Humana Gold Plus, as a Medicare HMO, cannot discriminate in coverage on the basis of health history or current health status once coverage has begun. Title 42 U.S.C. § 1395mm(c)(3)(D) mandates the organization to:

> provide assurances to the Secretary [of Health and Human Services] that it will not expel or refuse to re-enroll . . . because of the individual's health status or requirements for health care services, and that it will notify each such individual of such fact at the time of enrollment.

An argument can also be made that the assertion Humana uses risk classification data "in the content of an individual treatment decision for an individual patient" is contrary to the structure of the Medicare program. Since 1985, Medicare beneficiaries have had the option of using their Medicare coverage to enroll in a HMO which contracts with the Health Care Financing Administration, or HCFA. Carol S. Jimenez, *Medicare HMOS: A Consumer Perspective*, 26 SETON HALL LAW REV. 1195, 1195–96 (1996). Under

its Medicare contracts, the HCFA pays an HMO a set monthly fee for each Medicare beneficiary enrolled. The monthly fee or capitation payment is intended to equal ninety-five percent of the average amount the HCFA could have spent on a beneficiary in the community, referred to as the "average adjusted per capita cost" or "AAPCC," and varies by geographic area. *Id.* at 1196; *see also* 42 U.S.C. § 1395mm(a); 42 C.F.R. § 417.584 (1997) (HCFA payment allowances for covered services to HMOs with risk contracts); 42 C.F.R. § 417.588 (1997) (computation of adjusted AAPCC). To determine the AAPCC, the HCFA assigns each HMO to determine demographic class considering age, gender, Medicare entitlement status, institutionalization and Medicaid status. SHERYL TATAR DACSO, MANAGED CARE ANSWER BOOK (2d ed.1997). Medicare HMOs may offer additional services not covered by Medicare, such as routine physicals and prescription drug care. *Jimenez*, 26 SETON HALL LAW REV. 1195, 1205 (1996), and the HMOs may charge a premium for these additional services. DACSO, MANAGED CARE ANSWER BOOK, at 6–31. However, there is no authority to indicate a Medicare HMO underwrites, classifies or administers risks; the HCFA does this. *See id.* Plaintiffs maintain "Humana merely gambles that the additional services and concomitant premiums it receives, as well as the efficiencies it achieves in its distribution network, will allow it to provide services to those people, and at those prices, determined by the HCFA, at a profit."

It is also true a Medicare HMO cannot enter into a contract with medical providers and then relinquish all responsibility for the medical care its Medicare enrollees receive from providers. Federal law provides that an HMO which contracts with others to provide care for its enrollees is still liable for such care. 42 C.F.R. 417.401 (1997) (HMO may provide or arrange for other entitles to provide medical services to its Medicare enrollees, as long as it still "retains responsibility for the services"). Additionally, plaintiffs

---

ing or administering the terms of a bona fide benefit plan that is not subject to State laws that regulate insurance.

Paragraphs (1), (2), and (3) shall not be construed as a subterfuge to evade the purposes of subchapter I and III of this chapter.
42 U.S.C. § 12201.

allege the Humana defendants discriminated against them based upon clinical evaluations of the patients, not with regard to experience ratings or risk science.

Finally, the safe harbor provision may "not be used as a subterfuge to evade the purposes" of the ADA, 42 U.S.C. § 12201(c), "regardless of the date that an insurance or employer benefit plan was adopted." H.R.Rep. No. 485, 101st Cong., 2d Sess., pt. 3 at 71 (1990), *reprinted in* 1990 U.S.C.C.A.N. 446, 494; *see* H.R.Rep. No. 485, 101st Cong., 2d Sess., pt. 2 at 137 (1990), *reprinted in* 1990 U.S.C.C.A.N. 304, 420. Presuming the safe harbor provision is applicable, to prevail at this juncture Humana would have to establish a bona fide benefit plan engaged in lawful risk assessment and show their decisions were not a subterfuge for discrimination. The record, however, does not contain the actuarial, statistical and empirical data used in making all of its payment decisions and utilization decisions for the individual treatment decisions of the individual patients. The Humana defendants' affirmative defense argument they are insulated from liability and protected from further proceedings in this case by the safe harbor provision of the ADA is denied.

The Humana defendants next argue plaintiffs have failed to state a claim because defendants do not exercise the type of control over HealthTexas necessary to support an ADA claim, the Texas Medical Practices Act forbids the corporate practice of medicine and plaintiffs cannot recover under a joint venture theory of recovery. Regarding control, the ADA applies to entities which "operate" a "public accommodation." 42 U.S.C. § 12182(a). "Insurance offices," such as Humana Health Plans of Texas and Humana Gold Plus, are specifically included in the definition of public accommodation. *Id.* § 12181(7)(F). The Fifth Circuit has determined the term "operate" in the context of the public accommodation provision means "to put or keep in operation," "[t]o control or direct the functioning of," or "to conduct the affairs of, manage." *Neff v. American Dairy Queen Corp.,* 58 F.3d 1063, 1066 (5th Cir. 1995), *cert. denied,* 516 U.S. 1045, 116 S.Ct. 704, 133 L.Ed.2d 660 (1996) (citations omitted). The term operates for the purpose of the ADA means a right to control the allegedly discriminatory conditions. *Id.* at n. 9. The relevant inquiry is whether Humana had control over the actions alleged to have resulted in the discrimination charged.

Humana contends "plaintiffs have not plead[ed] that [the Humana] Defendants . . . controlled any aspect of the operations of Health Texas which they complain about." Plaintiffs, however, have alleged it was the health care delivery system in which the Humana defendants were participants, and particularly the financial arrangements which fueled the system, which controlled the delivery of health care and caused the acts of alleged discrimination about which plaintiffs complain. The Court finds this pleading sufficient as to the issue of control.

The record reflects Humana submitted testimony by affidavit that the requisite amount of control was not exercised by Humana. Plaintiffs contend the physician incentive plan in place at the time this cause of action accrued, and the payment scheme devised by Humana under which HealthTexas received a capitated amount per Medicare enrollee, evidence the Humana defendants exercised control by giving HealthTexas "a clear statement" of the incentive to undertreat patients. The record also shows a fact question of whether Humana regulated the following healthcare decisions made at HealthTexas: referrals, hospital admissions and stays, daily activities, scheduling of patients, length of patient visits and reporting and data submission. Humana is alleged to have conducted utilization visits to determine whether HealthTexas physicians were exhibiting "aberrant practice patterns," or required counseling, education, corrective actions or sanctions. Humana's motion to dismiss for failure to state a claim based upon lack of control over HealthTexas for purposes of the ADA is denied. To the extent the Humana defendants move for summary judgment on this ground, defendants' affidavits alleging a lack of control conflict with documentary evidence indicating otherwise.

Whether Humana complies with state prohibitions against the corporate practice of

medicine is an argument not raised by plaintiffs' amended complaint. Even if defendants were correct no claim could be advanced at the state level, this does not defeat plaintiffs' federal claims as the ADA and the Rehabilitation Act prohibit corporations from discriminating against individuals on the basis of a disability. 42 U.S.C. § 12182(a)(ADA), 29 U.S.C. § 794(a) (Rehabilitation Act).

Humana also contends plaintiffs cannot prove liability under a joint venture theory of recovery. Plaintiffs state they make no claim based on this theory. Rather, they use the term "joint enterprise" to describe the business relationship between the Humana defendants and HealthTexas:

> they acted as a joint enterprise with HealthTexas and Primary CareNet by virtue of their control over the medical practices and the physicians at HealthTexas. Together, these entities operate as a managed health care system to deliver a set of defined health care benefits to their enrollees.

As the plaintiffs' ADA claim has an element of control which is relevant to the description of the relationship between the parties, and considering plaintiffs representation they do not make a claim based on this theory, the Court concludes there is no joint venture claim to dismiss or upon which to grant summary judgment.[14] Plaintiffs shall not be allowed to assert a joint venture theory later in these proceedings.

■ Humana also argues the amended complaint does not allege violations of the ADA or Rehabilitation Act because medical treatment decisions are immune from section 504 Rehabilitation Act claims and plaintiffs have not shown their disparate treatment is linked solely to their disabilities. As discussed above, plaintiffs have pleaded particular acts of disability-based discrimination and offer summary judgment proof in support thereof. Humana relies on *Bowen v. American Hosp. Ass'n,* 476 U.S. 610, 106 S.Ct.

2101, 90 L.Ed.2d 584 (1986), for the proposition that medical treatment decisions are generally immune from scrutiny under the Rehabilitation Act. *Bowen,* however, "involved a challenge to federal regulations governing the treatment of disabled infants, not an actual instance of allegedly discriminatory treatment." *Aikins v. St. Helena Hosp.,* 843 F.Supp. 1329, 1338 n. 7 (N.D.Ca.1994). Under section 504 of the Rehabilitation Act, claims may be raised when medical treatment decisions are based solely on an individual's disability, as opposed to other criteria as, for example, in the *Bowen* case, where the issue was parental consent. *Id.; see also Naiman v. New York Univ.,* No. 95 Civ. 6469(LMM), 1997 WL 249970, at *2 (S.D.N.Y. May 13, 1997) (plaintiff's "claims relate to his exclusion from the participation in his medical treatment, not the treatment itself."). For the foregoing reasons, the motion to dismiss or alternatively for summary judgment based upon plaintiffs' failure to state ADA and Rehabilitation Act claims is denied.

## SUMMARY JUDGMENT AS TO THE INDIVIDUAL ENROLLEES

■ Humana moves for summary judgment as to their enrollees' ADA and Rehabilitation Act discrimination causes of action. HealthTexas and Primary CareNet move for summary judgment as to Exhix PPO enrollee Olga Murray.

Humana first contends there has been no testimony showing disabled persons are treated differently than other patients. The record contains the affidavit of Dr. Zamora in which he avers he personally observed disabled patients being denied the same kind of services covered under the Humana Gold Plan and provided to persons not suffering from disabilities. A former employee of HealthTexas also stated that disabled patients were treated worse than non-disabled patients:

---

14. Many of plaintiffs' allegations could have been brought under state statutory and common law medical malpractice theories of recovery. *See* Tex Civ.Prac. & Rem.Code Ann. §§ 88.001—88.003 (Vernon Supp.1998) (Texas Health Care Liability

Act). Plaintiffs have chosen not to bring those *pendente lite* and therefore any orders in this case are without prejudice to plaintiffs to pursue any state causes of action.

During my employment at HealthTexas, I had the opportunity to witness and did witness dozens of instances in which patients with chronic illnesses and disabilities were not treated as well as healthy patients. The healthy patients did not have to wait as long to see the doctor as patients with many health problems. There were some patients who would come in and be seen before the sicker patients, even though the sicker patients had been waiting longer.... People with chronic illnesses and disabilities sometimes had to wait two to three hours between the first waiting, the sub-waiting room, and the exam room. On many occasions, I saw [the Medical Director of Health Texas] pull the patient chart from the door of an exam room, glance at it, return the chart to the door and go on to another patient, leaving the first patient to continue waiting.

A genuine issue of material fact exists as to whether the enrollees were discriminated against because of their disabilities.

Humana argues plaintiffs negated their discrimination claims by stating in depositions they had no complaints about the care or treatment each received at HealthTexas. Ms. Barrientes stated there were times when she had to wait for extended periods before seeing a doctor or receiving medication. Ms. Mendiola avers she was denied proper treatment and kept waiting for long periods of time, as much as three hours, before she saw a physician. Mr. Mendiola testified he was not satisfied with the quality of care he was given and told of long waits. Mr. Herrera contended he did not receive pain medication because of conditions at HealthTexas, and also stated he was made to wait before he was examined by a medical professional. After reviewing the deposition testimony, and construing the evidence in the light most favorable to plaintiffs as must be done in this summary judgment proceeding, the Court concludes defendants have not carried their burden of showing plaintiffs voiced no complaints.

Defendants appear to agree with the Court's prologue analysis that the larger public policy issue is the debate of whether managed care is an appropriate vehicle for controlling health care costs. Defendants argue that if some requests for health care are denied, and disabled persons have more requests for tests and referrals, more disabled persons' requests will be denied. Here, however, there are specific allegations by a physician plaintiff, along with a former employee of HealthTexas, stating in affidavits that patients were forced to suffer delays and denials of care because they are disabled. This rebuts defendants' nondiscriminatory reason and raises genuine issues of fact of whether plaintiffs were discriminated against because they are disabled. In addressing ERISA breach of fiduciary duty claims brought against doctors and payors by enrollees, the Seventh Circuit stated:

> Our decision does not stand for the proposition that the existence of incentives *automatically* gives rise to a breach of fiduciary duty. Rather, we hold that incentives can rise to the level of a breach were, as pleaded here, the fiduciary trust between plan participants and plan fiduciaries no longer exists (i.e. where physician delay providing necessary treatment to, or withhold administering proper care to, plan beneficiaries for the sole purpose of increasing their bonuses).

*Herdrich v. Pegram,* 154 F.3d 362, 373 (7th Cir.1998) (emphasis in original).

 Humana also argues Mrs. Barrientes is not disabled under the ADA because she admits her previously diagnosed breast cancer does not now limit major life activities. The ADA contains three definitions of disability: (1) a physical or mental impairment which substantially limits one or more of major life activities; (2) a record of such an impairment; or (3) being regarded as having such an impairment. 42 U.S.C. § 12101(2)(A), (B), (C). Breast cancer is an "impairment" under the statute. *Ellison v. Software Spectrum, Inc.,* 85 F.3d 187, 190 (5th Cir.1996). The summary judgment evidence reflects Ms. Barrientes had a record of cancer and related illnesses which had limited her major life activities. Additionally, plaintiffs have offered the affidavit of Dr. Zamora which states Ms. Barrientes was considered by himself and others as disabled. This is sufficient to raise a fact issue concern-

ing disability under the ADA. Humana's motion for summary judgment as to its individual enrollees is denied.

■ HealthTexas and Primary CareNet move for summary judgment on plaintiff Olga Murray's claim defendants' violated the ADA and the Rehabilitation Act by not providing her with the location of Dr. Zamora after he left HealthTexas. Ms. Murray alleges defendants unlawfully discriminated against her and denied her the full and equal enjoyment of the medical care and treatment to which she was entitled under the terms of her health plan in violation of the ADA. In her deposition, however, Ms. Murray admitted she had not been delayed or denied any medical services to which she was entitled or delayed or denied medical care and treatment from defendants. Ms. Murray also concedes her discrimination claims do not deal with any medical services which were provided or not provided to her by defendants. Her only complaint is that defendants failed to advise her of Dr. Zamora's location following termination of his employment.

Ms. Murray and the other plaintiffs contend "as to each of the named plaintiffs, HealthTexas' intentional discrimination included destroying the doctor/patient relationship with Dr. Zamora." Although the Court recognizes the importance of the physician/patient relationship, plaintiffs' own summary judgment evidence negates their claims of intentional disability discrimination. A former employee of HealthTexas said in her affidavit she was instructed not to tell any patients where Dr. Zamora was located. Significantly, the affiant does not say she was instructed to tell only patients with disabilities that defendants did not know the locale of Dr. Zamora or that she was instructed to provide different information to people without disabilities.

■ As to plaintiff's Rehabilitation Act claim, Ms. Murray alleges defendants limited or denied her benefits and services solely because of her disability and defendants provided her benefits and services which were not as effective as the benefits and services provided to other patients. As with the ADA claim, Ms. Murray admits she has no griev-

ances about the medical services and benefits she received. Moreover, the contract between Ms. Murray and Ethix Life Insurance does not provide a right to receive the services of a particular physician for as long as she remains covered by Ethix. The Ethix PPO provider directory of 1997 supplied by Ms. Murray during her deposition states: "the status of doctors in the plan changes periodically, therefore, you should be aware that some of the doctors listed here may no longer be plan participants." The introduction also provides the participants have the freedom to choose any doctor or health professional they wish. A 1–800 number is provided so a participant could call Ethix if help were needed to select a physician. When Dr. Zamora was no longer at HealthTexas, HealthTexas referred Ms. Murray to a competent alternative physician by her own admission. Ms. Murray testified she saw the alternative physician a day before her scheduled appointment with Dr. Zamora, and remained his patient for approximately a year. The motion of HealthTexas and Primary CareNet for summary judgment as to plaintiff Olga Murray's claim is granted.

## CONCLUSION

IT IS THEREFORE ORDERED that the consolidated Motion to Dismiss or, in the Alternative, for Summary Judgment is GRANTED IN PART and DENIED IN PART as set forth below:

IT IS ORDERED that the Humana Defendants' request for dismissal or summary judgment is DENIED;

IT IS FURTHER ORDERED that HealthTexas and Primary Care Net's motion for summary judgment as to plaintiff Olga Murray is GRANTED. The motion by HealthTexas and Primary CareNet to Strike Plaintiff Olga Murray's Rebuttal of Defendants' Reply to Plaintiffs' Opposition to Defendants' Motion for Summary Judgment (docket no. 72) is DENIED.