[No. S082236. May 3, 2001.]

BARBARA McCALL, Individually and as Trustee, etc., Plaintiff and Appellant, v.
PACIFICARE OF CALIFORNIA, INC., et al., Defendants and Respondents.

## COUNSEL

Houck & Balisok, Russell S. Balisok, Steven C. Wilheim; Law Office of Carol S. Jimenez and Carol S. Jimenez for Plaintiff and Appellant.

Sara Lenz Lock, Bruce Vignery, Michael Schuster; Gill Deford; and Herbert Semmel for American Association of Retired Persons and Center for Medicare Advocacy as Amici Curiae on behalf of Plaintiff and Appellant.

Konowiecki & Rank, Jon N. Manzanares, Keith A. Weaver, Jeffrey D. Olster; Greines, Martin, Stein & Richland and Timothy T. Coates for Defendants and Respondents PacifiCare of California, Inc., and PacifiCare Health Systems, Inc.

Rosato & Samuels, Cary S. Samuels, Ellen Kamon, Pamela Sirkin; Hemer, Barkus & Clark, Davis, Grass, Goldstein & Housouer and Edward A. Stumpp for Defendant and Respondent Greater Newport Physicians, Inc.

Bonne, Bridges, Mueller, O'Keefe & Nichols, Nancy Flores; Greines, Martin, Stein & Richland, Robert A. Olson and Laura Boudreau for Empire Physicians Medical Group as Amicus Curiae on behalf of Defendants and Respondents.

## OPINION

**WERDEGAR, J.**—We granted review in this case, limited to the issue whether state law claims against a health maintenance organization (HMO), arising out of its refusal to provide services under a Medicare-subsidized health plan, fall within the exclusive review provisions of the Medicare Act requiring exhaustion of administrative remedies. (42 U.S.C. § 1395 et seq.)

As will appear, some disagreement exists among state and federal courts on this question, which has not yet been addressed by the United States Supreme Court. We conclude the claims made here do not fall within Medicare's exclusive review provisions. Accordingly, we affirm the judgment of the Court of Appeal.

FACTS

On review of the judgment of the Court of Appeal reversing the superior court's orders sustaining defendants' demurrers, we examine the complaint de novo to determine whether it alleges facts sufficient to state a cause of action under any legal theory, such facts being assumed true for this purpose. (*Santa Monica Beach, Ltd. v. Superior Court* (1999) 19 Cal.4th 952, 957 [81 Cal.Rptr.2d 93, 968 P.2d 993]; *Blank v. Kirwan* (1985) 39 Cal.3d 311, 318 [216 Cal.Rptr. 718, 703 P.2d 58].)

George McCall, who suffered from progressive lung disease, was a Medicare beneficiary enrolled in PacifiCare of California, Inc. (PacifiCare), an HMO. His primary care physician was Dr. Lakshmi Shukla; his physician provider group, Greater Newport Physicians, Inc. (GNP). Allegedly, Dr. Shukla, PacifiCare and GNP repeatedly refused to refer Mr. McCall to a specialist for a lung transplant or provide other needed care, and ultimately forced him to disenroll from PacifiCare in order to get on the Medicare list for a transplant. During that time, Mr. McCall's condition worsened.[1]

George McCall and his wife, Barbara (the McCalls), brought suit against Dr. Shukla, PacifiCare and GNP, alleging in their operative first amended complaint eight causes of action for tort damages (negligence, wilful misconduct, four counts of fraud including fraudulent misrepresentation and constructive fraud, and negligent and intentional infliction of emotional distress) and a ninth cause of action for injunctive relief from unfair business practices. The complaint alleged defendants had violated statutory duties they owed plaintiffs, including (A) the duty to provide ready referrals consistent with good professional practice (Health & Saf. Code, § 1367, subd. (d)); (B) the duty to render medical decisions unhindered by fiscal and administrative management (*id.*, § 1367, subd. (g)); (C) the duty to provide for expedited review and to notify Mr. McCall of his right to expedited review from the California Department of Corporations when defendants' decisions involved imminent and serious threat to his health (*id.*, § 1368.01, subd. (b)); (D) the duty to engage in sufficient quality assurance activities to ensure that the requirements of California law were met in providing services to Mr. McCall (*id.*, § 1370); (E) the duty not to require Mr. McCall to

[1]Mr. McCall died shortly before the Court of Appeal rendered its decision in this case, immediately after undergoing a lung transplant paid for by Medicare.

disenroll except for very limited reasons, such as nonpayment of premiums (*id.*, § 1365, subd. (a)); (F) PacifiCare's duty to retain responsibility for all services, including those that it contracted with others to provide Mr. McCall (42 C.F.R. § 417.401 (1999)); (G) the duty to ensure that required services were available and accessible to Mr. McCall (42 C.F.R. § 417.416 (1999)); (H) the duty to provide written notice of noncoverage, including the reason for noncoverage and Mr. McCall's appeal rights, before discharging him from hospital care (42 C.F.R. § 417.440(f) (1999)); (I) the duty not to disenroll Mr. McCall, and not to encourage him to disenroll, from PacifiCare (42 C.F.R. § 417.460(a) (1999)); and (J) the duty to provide grievance procedures for issues that do not involve organizational determinations and Medicare appeal rights (42 C.F.R. §§ 417.600, 417.604, 417.606 (1999)).

GNP and PacifiCare (hereafter defendants)[2] demurred, arguing each of plaintiffs' causes of action arose under the Medicare Act, 42 United States Code section 1395 et seq. and, pursuant to 42 United States Code section 405(g), was therefore subject to judicial review only in federal court, after exhaustion of administrative review procedures. The trial court sustained the demurrers without leave to amend and entered judgment accordingly. The Court of Appeal reversed, and we granted review.

DISCUSSION

The Medicare Act, 42 United States Code section 1395 et seq. (the Act or Medicare), a part of the Social Security Act, established a federally subsidized health insurance program that is administered by the Secretary of Health and Human Services (the Secretary) through the Health Care Financing Administration (HCFA). Part A of Medicare, 42 United States Code section 1395c et seq., covers the cost of hospitalization and related expenses that are "reasonable and necessary" for the diagnosis or treatment of illness or injury. (42 U.S.C. § 1395y(a)(1)(A).) Part B of Medicare (42 U.S.C. § 1395j et seq.) establishes a voluntary supplementary medical insurance program for Medicare-eligible individuals and certain other persons over age 65, covering specified medical services, devices, and equipment. (See 42 U.S.C. §§ 1395k, 1395o.) The Act provides for the delegation of Medicare benefit administration to HMO's, which are authorized, pursuant to contracts with the HCFA, to manage benefit requests by Medicare beneficiaries. (*Wartenberg v. Aetna U.S. Healthcare, Inc.* (E.D.N.Y. 1998) 2 F.Supp.2d 273, 276.)

The determination whether an individual is entitled to benefits, and the amount of benefits, is entrusted to the Secretary in accordance with regulations prescribed by him or her. (42 U.S.C. § 1395ff(a).) Judicial review of a

---

[2]GNP and Dr. Shukla also demurred on other, more limited grounds, none of which is before this court.

claim for benefits is available only after the Secretary has rendered a " 'final decision' " on the claim, and only in the manner provided for claims for old age and disability benefits arising under the Social Security Act. (*Heckler v. Ringer* (1984) 466 U.S. 602, 605 [104 S.Ct. 2013, 2016-2017, 80 L.Ed.2d 622] (*Ringer*); 42 U.S.C. §§ 405(g), (h), 1395ff(b)(1).)[3] The relevant provisions of the Social Security Act, 42 United States Code section 405(g) and (h), read together, provide that a final decision by the Secretary on a claim "arising under" Medicare may be reviewed by no person, agency or tribunal except in an action brought in federal district court, and then only after exhausting administrative remedies as described above. (42 U.S.C. §§ 405(h), 1395ii; see 42 U.S.C. §§ 1395ff(b)(1), 1395mm(c)(5)(B).)

■ The question in this case, then, is whether the McCalls' complaint alleges a claim "arising under" the Medicare Act, even though none of the claims seeks payment or reimbursement of Medicare claims. ■ The seminal decision in this area, *Ringer, supra*, 466 U.S. 602, held that a claim arises under Medicare if (1) " 'both the standing and the substantive basis for the presentation' " of the claim is the Medicare Act (*id.* at p. 615 [104 S.Ct. at p. 2022]), or (2) the claim is " 'inextricably intertwined' " with a claim for Medicare benefits (*id.* at p. 614 [104 S.Ct. at p. 2021]). The high court, however, recognized that a claim that is "wholly 'collateral' " to a claim for benefits under the Act is not subject to the administrative process; the court also suggested exhaustion would be excused if a claimant made a colorable showing that an erroneous denial of benefits would injure him or her in a

---

[3]In a case involving a non-HMO, fee-for-service claim, the United States Supreme Court described the administrative appeals process as follows: "[T]he Medicare Act authorizes the Secretary to enter into contracts with fiscal intermediaries providing that the latter will determine whether a particular medical service is covered by Part A, and if so, the amount of the reimbursable expense for that service. 42 U.S.C. § 1395h; 42 CFR § 405.702 (1983). If the intermediary determines that a particular service is not covered under Part A, the claimant can seek reconsideration by the . . . (HCFA) in the Department of Health and Human Services. 42 CFR §§ 405.710-405.716 (1983). If denial of the claim is affirmed after reconsideration and if the claim exceeds $100, the claimant is entitled to a hearing before an administrative law judge (ALJ) in the same manner as is provided for claimants under Title II of the Act. 42 U.S.C. § 1395ff(b)(1)(C), (b)(2); 42 CFR § 405.720 (1983). If the claim is again denied, the claimant may seek review in the Appeals Council. 42 CFR §§ 405.701(c), 405.724 (1983) (incorporating 20 CFR § 404.967 (1983)). If the Appeals Council also denies the claim and if the claim exceeds $1,000, only then may the claimant seek judicial review in federal district court of the 'Secretary's final decision.' 42 U.S.C. §§ 1395ff(b)(1)(C), (b)(2)." (*Ringer, supra*, 466 U.S. at pp. 606-607 [104 S.Ct. at pp. 2017]; see generally 42 C.F.R. § 405.701 et seq. (1999) [describing the Medicare fee-for-service appeals process].) A Medicare beneficiary enrolled in an HMO may challenge the Secretary's final determination in the same manner. (42 U.S.C. § 1395mm(c)(5)(B); see 42 C.F.R. §§ 417.600-417.638 (1999).)

way that could not be remedied by the later payment of benefits. (*Id.* at p. 618 [104 S.Ct. at p. 2023].)[4]

In *Ringer*, the plaintiffs were four Medicare beneficiaries who suffered from respiratory distress; three had had surgery known as bilateral carotid body resection (BCBR) and were seeking reimbursement of the cost thereof, and one sought to have BCBR surgery but claimed he could not afford it absent Medicare coverage. (*Ringer, supra*, 466 U.S. at pp. 605, 609-610 [104 S.Ct. at pp. 2018-2019].) The Secretary had ruled that Medicare did not cover BCBR when performed to relieve respiratory distress because the procedure lacked the general acceptance of the professional medical community and thus was not "reasonable and necessary" within the meaning of Medicare. (*Id.* at p. 607 [104 S.Ct. at p. 2018].) The *Ringer* plaintiffs, none of whom had exhausted their administrative remedies, filed a complaint in federal district court seeking declaratory and injunctive relief. (*Id.* at pp. 610-611 [104 S.Ct. at pp. 2019-2020].) The district court dismissed the complaint in its entirety for lack of jurisdiction, concluding the essence of the claim was one of entitlement to benefits for the BCBR procedure and that the plaintiffs therefore were required to exhaust administrative remedies before seeking relief in federal court. (*Id.* at p. 611 [104 S.Ct. at pp. 2019-2020].) The Court of Appeals for the Ninth Circuit reversed, concluding exhaustion would be futile and might not fully compensate the plaintiffs for the injuries they asserted. (*Id.* at p. 612 [104 S.Ct. at p. 2020].) The Supreme Court reversed.

The high court noted that, in *Weinberger v. Salfi* (1975) 422 U.S. 749, 760-761 [95 S.Ct. 2457, 2464-2465, 45 L.Ed.2d 522], where the plaintiffs had sought an award of Social Security benefits (a type of claim that, as noted above, is subject to the same administrative exhaustion provisions as those seeking Medicare benefits), it had construed the " 'claim arising under' language quite broadly to include any claims in which 'both the standing and the substantive basis for the presentation' of the claims is the Social Security Act." (*Ringer, supra*, 466 U.S. at p. 615 [104 S.Ct. at p. 2022]; see *Weinberger v. Salfi, supra*, at pp. 760-761 [95 S.Ct. at pp. 2464-2465] [constitutional challenge to the duration-of-relationship eligibility statute was a " 'claim arising under' " the Social Security Act, even though it was also, in another sense, a claim arising under the Constitution].) Any other conclusion, the high court reasoned, would allow claimants substantially to undercut Congress's carefully crafted scheme for administering Medicare. (*Ringer, supra*, at p. 621 [104 S.Ct. at pp. 2024-2025].)

---

[4]The dissent (dis. opn., *post*, at p. 438) suggests the possible imposition by the Secretary of civil monetary penalties against contracting HMO's for violations of the Medicare Act justifies a conclusion that plaintiffs' state law claims are preempted. The suggestion, however, ignores *Ringer*'s focus on the presence or absence of a *remedy for injuries suffered*.

Because the Medicare beneficiaries in *Ringer*, at bottom, sought Medicare reimbursement or authorization for a particular surgical procedure, the high court had no difficulty concluding the claim was one in which both the standing and the substantive basis of the claim was the Act, and that the complaint was, thus, one "arising under" Medicare. Perhaps for that reason, the court did not define the phrase "inextricably intertwined," as used in this context, or elaborate on the extent to which a state law claim may be "intertwined" with a Medicare claim before it becomes inextricably so. (See *Ringer*, *supra*, 466 U.S. at pp. 611, 614-615 [104 S.Ct. at pp. 2020, 2021-2022].) A closer question than that posed in *Ringer*, however, arises where the complaint seeks, on state tort law grounds, not reimbursement for an assertedly covered procedure, but, rather, damages assertedly flowing from conduct only incidentally related to the wrongful denial of a benefits claim.

Such a situation was present in *Ardary v. Aetna Health Plans of California, Inc.* (9th Cir. 1996) 98 F.3d 496, certiorari denied (1997) 520 U.S. 1251 [117 S.Ct. 2408, 138 L.Ed.2d 174] (*Ardary*), on which the McCalls rely. In *Ardary*, a Medicare beneficiary who lived in a rural area and was enrolled in an HMO suffered a heart attack and was refused airlift transportation to a more sophisticated medical facility than those available nearby. When the beneficiary died, her family sued the HMO and its contractor, Arrowest Physician Association, in state court. They sought compensatory and punitive damages on six state tort law theories: negligence, intentional and/or negligent infliction of emotional distress, intentional and/or negligent misrepresentation, and professional negligence. (*Id.* at pp. 497-498.) The defendants in *Ardary* removed the case to federal court and sought dismissal, arguing all of the plaintiffs' state law causes of action related to the denial of Medicare benefits and, therefore, were preempted by federal law requiring they be addressed through the Medicare administrative appeals process. The Court of Appeals for the Ninth Circuit concluded the complaint did not state any claims in which both the standing and the substantive basis for the presentation of the claims was the Medicare Act; rather, the complaint was predicated on state common law theories. (*Ardary*, *supra*, at pp. 499-500.) The *Ardary* court also concluded the plaintiffs' state law claims were not " 'inextricably intertwined' " with the assertedly wrongful denial of Medicare benefits because the plaintiffs were not seeking to recover benefits, and because the harm the defendants allegedly caused could not be remedied by the payment of benefits. (*Id.* at p. 500.)[5]

Defendants suggest that, although the *Ardary* court recited the test articulated in *Ringer*, *supra*, 466 U.S. at pages 614-615 [104 S.Ct. at pages

[5] A number of subsequent decisions have favorably cited and relied on *Ardary*. (E.g., *Plocica v. Nylcare of Texas, Inc.* (N.D.Tex. 1999) 43 F.Supp.2d 658, 663 [complaint alleging wrongful death under state law was not preempted by Medicare; case remanded to state court]; *Zamora-Quezada v. HealthTexas Medical Group* (W.D.Tex. 1998) 34 F.Supp.2d 433,

2021-2022], it did not address or resolve the potential conflict between an award of state law tort damages proximately resulting from a wrongful denial of Medicare benefits, on the one hand, and the possibility that an exhaustive administrative appeal would determine that Medicare benefits were not *wrongly* denied in the particular case, on the other. Because, as *Ringer* made clear, Congress has vested in the Secretary the exclusive power to administer the Medicare system, defendants contend that any state court damage award that is logically dependent on a finding of wrongful denial of benefits is " 'inextricably intertwined' " (*Ringer, supra,* at p. 614 [104 S.Ct. at p. 2021]) with a Medicare claim.

Such was the conclusion of the Court of Appeal in *Redmond v. Secure Horizons, Pacificare, Inc.* (1997) 60 Cal.App.4th 96 [70 Cal.Rptr.2d 174] (*Redmond*). In that case, the plaintiff HMO subscriber sued her HMO on various state contract and tort law theories for its initial denial of coverage and subsequent delay in reimbursing her for health care expenses covered

---

440 [complaint by physicians and Medicare HMO beneficiaries, alleging that HMO's created contractual arrangement that resulted in discrimination against the disabled in violation of the Americans with Disabilities Act, the Rehabilitation Act and various state law theories, did not arise under Medicare; federal district court denied defendants' motion to dismiss for failure to exhaust administrative remedies]; *Wartenberg v. Aetna U.S. Healthcare, Inc., supra,* 2 F.Supp.2d at pp. 277-278 [complaint alleging wrongful death under state law not preempted by Medicare; case remanded to state court]; *Albright v. Kaiser Permanente Medical Group* (N.D.Cal., Aug. 3, 1999, No. C98-0682 MJJ) 1999 WL 605828, pp. *3-*4 [a complaint alleging unfair business practices, violation of the covenant of good faith and fair dealing, and fraud did not arise under Medicare; case remanded to state court]; *Kelly v. Advantage Health, Inc.* (E.D.La., May 11, 1999, Civ. A. No. 99-0362) 1999 WL 294796, at pp. *4-*5, *7 [a complaint alleging negligence and violation of Louisiana Health Maintenance Organization Act, La. Rev. Stat. § 22:2001 et seq., did not arise under Medicare; case remanded to state court]; *Berman v. Abington Radiology Associates,* Inc. (E.D.Pa., Aug. 14, 1997, Civ. A. No. 97-3208) 1997 WL 534804, at p. *3 [a complaint alleging professional negligence did not arise under Medicare; case remanded to state court]; see also *Wright v. Combined Ins. Co. of America* (N.D.Miss. 1997) 959 F.Supp. 356, 363 [not citing *Ardary,* but concluding fact that disposition of the plaintiff's state law claims might require some interpretation of the Medicare Act did not mean such claims arose under the Act; case remanded to state court].)

Other decisions have distinguished *Ardary* without criticizing its reasoning. (E.g., *Jamaica Hosp. Nursing Home v. Oxford Health Plans* (S.D.N.Y., Sept. 26, 2000, No. 99 Civ. 9541 (AGS)) 2000 WL 1404930, at p. *3 [nursing home's complaint alleging it provided medical treatment to beneficiary and, under its assignment of insurance rights from beneficiary, was entitled to payment from HMO for the cost of the treatment was, at bottom, a claim for reimbursement of Medicare benefits; because nursing home had failed to exhaust administrative remedies, federal district court dismissed complaint for lack of subject matter jurisdiction]; *Helping Hands Professional Home Health Services, Inc. v. Shalala* (S.D.Cal., Aug. 1, 1997, No. 97-1043-IEG(LSG)) 1997 WL 778990, at p. *4 [service provider's complaint, alleging that fiscal intermediary failed to comply with regulations governing payments under Medicare system, arose under Medicare; because provider had failed to exhaust administrative remedies, federal district court dismissed complaint for lack of subject matter jurisdiction].)

under her Medicare-subsidized plan. The superior court dismissed the complaint, ruling it lacked jurisdiction because the plaintiff's causes of action arose under Medicare. The Court of Appeal affirmed. The fact the plaintiff's causes of action were based on her contractual relationship with the HMO did not mean her claims did not arise under Medicare, the court reasoned; indeed, the contract expressly provided that coverage determinations would be based on the Medicare Act and resolved through the multilevel Medicare administrative review process. (*Redmond, supra,* at p. 101.) Moreover, the Court of Appeal held, each of the plaintiff's state law causes of action was inextricably intertwined with a claim that she was entitled to the reimbursement she eventually received. (*Id.* at p. 102.)

The plaintiff in *Redmond* argued her claim was based, not on her entitlement to benefits, but on the defendant's conduct with respect to her claim for benefits. The Court of Appeal disagreed: "This argument fails because the alleged wrongfulness of defendant's conduct depends on whether plaintiff was entitled to payment of her claim. The fact that defendant ultimately paid her claim does not necessarily establish that plaintiff was *entitled* to such payment." (*Redmond, supra,* 60 Cal.App.4th at p. 102.)

Finally, the *Redmond* plaintiff contended her case fell outside the administrative exhaustion requirement because, as recognized in *Ringer, supra,* 466 U.S. at page 618 [104 S.Ct. at page 2023], and *Ardary, supra,* 98 F.3d at page 500, the initial denial and subsequent delay in paying benefits caused injury that could not be remedied by the later payment of benefits. The Court of Appeal dismissed the contention, concluding the plaintiff could have pressed her claim through the administrative review process. The court opined the administrative process governs not only coverage determinations but also " 'any other determination *with respect to* a claim for benefits' " (*Redmond, supra,* 60 Cal.App.4th at p. 103), and observed that the Secretary can order civil money penalties or " 'any other remedies authorized by law' " (*ibid.*).[6] *Redmond,* however, cited no authority for the implied proposition that the Secretary is empowered to award damages for violations of state tort law.[7]

The *Redmond* court's rationale—i.e., that the plaintiff's state tort law claims were inextricably intertwined with a Medicare claim because the

[6]The federal district court in *Albright v. Kaiser Permanente Medical Group, supra,* 1999 WL 605828, at page *4, observed that "*Redmond* has not been cited as persuasive authority in any subsequent opinions interpreting whether state law claims arise under the Act." A decision not citing *Redmond,* but employing a similar analysis to reach a similar conclusion, is *Wilson v. Chestnut Hill Healthcare* (E.D.Pa., Feb. 22, 2000, Civ. A. No. 99-CV-1468) 2000 WL 204368.

[7]*Kelly v. Advantage Health, Inc.,* asserts the contrary. "Indeed, the legislative history indicates that the administrative remedies and specific judicial review procedures were established for 'quite minor matters,' such as amount determinations of specific Medicare

alleged wrongfulness of the defendant's conduct depended on whether the plaintiff was, in fact, entitled to payment of her claim—has a certain logic. In applying one portion of the *Ringer* analysis, however, the *Redmond* court elided over the other. That is, it failed adequately to explain how the alleged harms suffered by the *Redmond* plaintiff could be remedied through the Medicare administrative review process. If those harms could not be so remedied, then the *Redmond* court's holding hinges on a conclusion that, by establishing an administrative process for Medicare benefit determinations, Congress must have intended to oust state courts of jurisdiction to enforce such of their own tort laws as may be implicated by conduct incidental to benefit determinations. We are directed to no evidence supporting such a conclusion.

■ We presume that in enacting laws, Congress does not intend to preempt state regulation of the same subject matter unless a contrary intent is made clear. (*Medtronic, Inc. v. Lohr* (1996) 518 U.S. 470, 485 [116 S.Ct. 2240, 2250, 135 L.Ed.2d 700]; *Cipollone v. Liggett Group, Inc.* (1992) 505 U.S. 504, 516 [112 S.Ct. 2608, 2617, 120 L.Ed.2d 407].) The classic example of clear congressional intent to preempt state remedies is found in the Employee Retirement Income Security Act of 1974 (ERISA), 29 United States Code section 1001 et seq., governing employee benefit plans, including health insurance. ERISA expressly and broadly preempts state law, providing it "shall supersede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan . . . ." (29 U.S.C. § 1144(a); see *Ingersoll-Rand Co. v. McClendon* (1990) 498 U.S. 133, 139-140 [111 S.Ct. 478, 482-484, 112 L.Ed.2d 474] [ERISA preempts employee's state law claim of wrongful discharge in order to avoid paying pension benefits]; *Pilot Life Ins. Co. v. Dedeaux* (1987) 481 U.S. 41, 47-48 [107 S.Ct. 1549, 1552-1553, 95 L.Ed.2d 39] [ERISA preempts state law tort and contract claims against insurer for bad faith denial of claim].)

No intent to displace state tort law remedies was expressed in the Medicare Act as it read at the time relevant to this case. (*Ardary, supra*, 98 F.3d at pp. 501-502.) To the contrary, "[t]he first section of the Medicare Act explicitly states [Congress's] intent to minimize federal intrusion in the area." (*Massachusetts Medical Soc. v. Dukakis* (1st Cir. 1987) 815 F.2d 790,

benefits. See *Bowen v. Michigan Academy of Family Physicians*, 476 U.S. 667, 680 [106 S.Ct. 2133, 2141, 90 L.Ed.2d 623] (1986); *Ardary*, 98 F.3d at 501. The administrative agency in charge of applying the administrative procedure set forth in the Act does not even possess the authority to assess the validity or merit of tortious claims or to grant relief for the types of state law causes of action at issue here. Thus, under the administrative process, plaintiff would most likely be precluded from receiving damages for any of the wrongs that have allegedly been committed against him." (*Kelly v. Advantage Health, Inc., supra*, 1999 WL 294796, at p. *7.)

791; *Shands Teaching Hosp. v. Humana Medical* (Fla.Dist.Ct.App. 1999) 727 So.2d 341, 344.) Title 42, section 1395 of the United States Code provides: "Nothing in this subchapter shall be construed to authorize any Federal officer or employee to exercise any supervision or control over the practice of medicine or the manner in which medical services are provided, or over the selection, tenure, or compensation of any officer or employee of any institution, agency, or person providing health services; or to exercise any supervision or control over the administration or operation of any such institution, agency, or person." Indeed, the Act specifically requires HMO's and other Medicare providers to be state licensed. (42 U.S.C. § 1395mm(b).) By clear implication, therefore, Congress left open a wide field for the operation of state law pertaining to standards for the practice of medicine and the manner in which medical services are delivered to Medicare beneficiaries.

The conclusion that Congress, in enacting the Medicare Act, did not intend to displace the state tort remedies with which we are here concerned is strengthened by consideration of subsequent amendments to the Act. Shortly before the McCalls filed the initial complaint in this case, the Balanced Budget Act of 1997 (the BBA) became law. (Pub.L. No. 105-33 (Aug. 5, 1997) 111 Stat. 328, codified at 42 U.S.C. § 1395w-21 et seq.) The BBA enacted a new part of Medicare known as "Medicare + Choice" that allows a new range of Medicare managed care options. HMO's contracting with Medicare, such as PacifiCare, automatically became Medicare + Choice plans effective January 1, 1999. (See 42 U.S.C. § 1395mm(k).) The BBA is noteworthy for its addition of an express limited preemption provision to the Medicare Act. By its terms, Medicare now preempts state laws mandating benefits to be covered, mandating inclusion of providers and suppliers, and coverage determinations. (42 U.S.C. § 1395w-26(b)(3).) Pursuant to the related regulations, determinations on issues other than whether a service is covered under a Medicare + Choice contract fall outside the definition of coverage determinations. (42 C.F.R. § 422.402 (1999).) All other types of state laws not inconsistent with Medicare standards are permitted. (*Ibid.*) The preamble to HCFA's request for final comments on the interim final rule implementing the amendments states: "Prior to the BBA, section 1876 of the Act [(42 U.S.C. § 1395mm)] (governing Medicare risk and cost contracts with HMOs and competitive medical plans) did not contain any specific preemption provisions. However, section 1876 requirements could preempt a State law or standard based on general constitutional Federal preemption principles . . . . Put another way, if Federal law permitted the HMO to do what State law required, there was no preemption. In practice, rarely, if ever, did Federal law preempt State laws affecting Medicare prepaid plans. For example, Medicare risk plans operating in States with mandated benefit laws

were generally required to comply with such State laws. Compliance with the State mandated benefit law was not viewed as interfering with the ability of plans to function as Medicare risk contractors under Federal standards. . . . [¶] . . . [¶] . . . [T]he specific preemption [added by the BBA] does not preempt State remedies for issues other than coverage under the Medicare contract (i.e. tort claims or contract claims under State law are not preempted). The same claim or circumstance that gave rise to a Medicare appeal may have elements that are subject to State remedies that are not superseded. For example, [a Medicare + Choice] organization's denial of care that a beneficiary believes to be covered care is subject to the Medicare appeals process, but under our interpretation of the scope of the specific preemption on coverage decisions, the matter may also be the subject of a tort case under State law if medical malpractice is alleged, or of a state contract law claim if an enrollee alleges that the [Medicare + Choice] organization has obligated itself to provide a particular service under State law without regard to whether it is covered under its [Medicare + Choice] contract." (63 Fed.Reg. 34967, 35012, 35013 (June 26, 1998).) Because, prior to the BBA, Medicare preemption of state law claims was even narrower than the limited preemption enacted by the BBA, these comments strongly imply that state law claims such as those involved in the present case were not preempted under then applicable law.

As the McCalls observe, Medicare regulations provide for administrative review of a limited class of claims (42 C.F.R. § 417.600 et seq. (1999)), not including those pertaining to quality of care, marketing problems and forced disenrollment such as the McCalls have alleged in their complaint. Absent clear indication of congressional intent, we decline to find preemption of claims, founded in California law, that find no remedy under the Medicare administrative process.

We must now turn to the specific causes of action contained in the first amended complaint to determine whether any is "inextricably intertwined" with a claim for Medicare benefits. Neither the high court in *Ringer, supra,* 466 U.S. 602, nor the Ninth Circuit in *Ardary, supra,* 98 F.3d 496, essayed a definition of this key phrase. The Court of Appeal in *Redmond, supra,* 60 Cal.App.4th 96, may be understood to have held that any claim incidental to a coverage determination, whether it seeks payment (or reimbursement) for medical services or tort damages resulting from the manner in which coverage was denied, is inextricably intertwined with a claim for Medicare benefits. (*Id.* at pp. 102-103.) Defendants urge us to adopt such a reading of the Act.

We believe *Redmond* painted with too broad a brush in so holding. A Medicare provider may violate state common law or statutory duties owing

to beneficiaries, unrelated to its Medicare coverage determinations. The "inextricably intertwined" language in *Ringer* is more correctly read as sweeping within the administrative review process only those claims that, "at bottom," seek reimbursement or payment for medical services, but not a claim *not* seeking such reimbursement or payment, which claim as pleaded incidentally refers to a denial of benefits under the Medicare Act. (See *Ringer, supra,* 466 U.S. at pp. 614-615 [104 S.Ct. at pp. 2021-2022].) The latter type of state-law-based claim by Medicare beneficiaries is not subject to the administrative review process and may be pursued in our state courts. In the language of *Ringer,* at page 618 [104 S.Ct. at page 2023], such claims are collateral to, not inextricably intertwined with, Medicare benefit claims.

For example, a provider may negligently fail to use ordinary skill and care in treating a beneficiary, or properly to advise the beneficiary concerning his health condition or appropriate treatment options, whether or not such options are covered by Medicare, thus preventing the beneficiary from seeking such treatment even at his own expense. Or a provider may fail to provide appropriate referrals to specialists, and thus prevent the beneficiary from obtaining appropriate care, again without regard to coverage. The McCalls' first and second causes of action, for negligence and wilful misconduct, respectively, set forth such allegations and enumerate the statutory and regulatory bases of the relevant duties (see *ante,* pp. 415-416), none of which necessarily implicates a coverage determination or falls within the scope of the Medicare administrative review process.

A provider may make misrepresentations regarding the nature or extent of the services it intends to provide, either in its application for HMO licensure to the California Department of Corporations or in its marketing materials disseminated to potential enrollees. If the injury to the enrollee is foreseeable, a *Randi W.* cause of action[8] or a claim of fraud may be stated.[9] The McCalls' third, fourth and fifth causes of action allege such claims, none of

---

[8]See *Randi W. v. Muroc Joint Unified School Dist.* (1997) 14 Cal.4th 1066 [60 Cal.Rptr.2d 263, 929 P.2d 582, 68 A.L.R.5th 719].

[9]We note that the recent decision in *Buckman Co. v. Plaintiffs' Legal Committee* (2001) 531 U.S. 341 [121 S.Ct. 1012, 148 L.Ed.2d 854] concluded that a state law action seeking damages for injuries allegedly caused by Food and Drug Administration (FDA) approved bone screws, predicated on a "fraud-on-the-FDA" theory, was preempted by the Federal Food, Drug, and Cosmetic Act, as amended by the Medical Device Amendments of 1976, 21 United States Code section 301. The high court reasoned that "[p]olicing fraud against federal agencies is hardly 'a field which the States have traditionally occupied,' [citation], such as to warrant a presumption against finding federal pre-emption of a state-law cause of action." (*Buckman, supra,* 531 U.S. at p. 348 [121 S.Ct. at p. 1017, 148 L.Ed.2d at p. 860].) The court contrasted "situations implicating 'federalism concerns and the historic primacy of state regulation of matters of health and safety,'" where a "presumption against pre-emption obtains." (*Id.* at p. 348 [121 S.Ct. at p. 1017, 148 L.Ed.2d at p. 861], citing *Medtronic, Inc. v.*

which necessarily implicates coverage determinations or falls within the scope of the Medicare administrative review process.

A provider may breach the fiduciary duty it owes the enrollee (see *Moore v. Regents of University of California* (1990) 51 Cal.3d 120, 129 [271 Cal.Rptr. 146, 793 P.2d 479, 16 A.L.R.5th 903]), inter alia, by permitting its financial interest detrimentally to affect treatment decisionmaking or failing to disclose such interest. The McCalls' sixth cause of action alleges such a claim, which does not necessarily implicate coverage determinations or fall within the scope of the Medicare administrative review process.

If a defendant's violations of state law duties are sufficiently outrageous, a claim for negligent or intentional infliction of emotional distress may be stated; the McCalls' seventh and eighth causes of action allege such violations, none of which necessarily implicates coverage determinations or falls within the scope of the Medicare administrative review process.

Finally, such violations of statutory duties, none necessarily implicating coverage determinations or falling within the scope of the Medicare administrative review process, may amount to unfair practices as prohibited by Business and Professions Code section 17200; the McCalls' ninth cause of action so alleges.[10]

Because the McCalls may be able to prove the elements of some or all of their causes of action without regard, or only incidentally, to Medicare coverage determinations, because (contrary to the dissent's characterization of the complaint) none of their causes of action seeks, at bottom, payment or reimbursement of a Medicare claim or falls within the Medicare administrative review process, and because the harm they allegedly suffered thus is not remediable within that process, it follows that the Court of Appeal correctly reversed the trial court's orders sustaining defendants' demurrers without leave to amend.[11]

We therefore affirm the judgment of the Court of Appeal and disapprove the decision in *Redmond v. Secure Horizons, Pacificare, Inc., supra,* 60 Cal.App.4th 96, to the extent it is inconsistent with this opinion.

---

*Lohr, supra,* 518 U.S. at p. 485 [116 S.Ct. at p. 2250].) To the extent the McCalls' complaint alleges fraud on the HCFA, defendants may, on remand, assert it is preempted under the rule in *Buckman.*

[10]This case does not call upon us to determine the sufficiency of any of the McCalls' allegations to state a cause of action under California law, and we express no opinion on whether the claims ultimately will be proven.

[11]Defendants' reliance on *Bodimetric Health Services v. Aetna Life & Cas.* (7th Cir. 1990) 903 F.2d 480, *Midland Psychiatric Associates, Inc. v. U.S.* (8th Cir. 1998) 145 F.3d 1000, and *Marin v. HEW, Health Care Financing* (9th Cir. 1985) 769 F.2d 590, is misplaced: those cases are distinguishable from the present one, in that they were actions seeking tort damages for harm allegedly sustained as a result of improper denial of claims, not, as here, claims arising from violations of duties separate from the duty to pay Medicare benefits.

George, C. J., Mosk, J., Kennard, J., and Chin, J., concurred.

**BAXTER, J.,** Dissenting.—The Medicare Act (42 U.S.C. § 1395 et seq.) (hereafter sometimes referred to as Medicare or the Act) is a massive federally insured program that covers health services for the elderly and disabled. Congress has decreed that any enrollee of a Medicare health maintenance organization (HMO) plan who wishes to challenge the HMO's denial of health services under Medicare must do so through Medicare's administrative review process; if that process yields a final decision that is adverse to the enrollee, then judicial review must be sought in federal court. (42 U.S.C. § 1395ff.)

Disregarding that congressional mandate and key United States Supreme Court authority, the majority opinion allows virtually any Medicare HMO plan enrollee to bring suit in state court to challenge an HMO's denial of Medicare benefits. Enrollees may bypass Medicare's exhaustion requirements simply by styling their challenges as claims for tort damages. As a result, questions regarding which medical procedures are or should be covered by Medicare may now be decided outside of Medicare's exclusive review process by California judges and juries on an ad hoc basis.

Congress acted deliberately to ensure uniform administrative and federal accountability for Medicare HMO decisionmaking. Yet today's decision sets the stage for potential conflict between an award of state law tort damages following a determination in a state court that Medicare benefits were wrongly denied, on the one hand, and the possibility that an exhaustive administrative appeal, followed by federal court review, would determine that Medicare benefits were *not wrongly denied* in the particular case and in other comparable cases, on the other. The two cannot be squared; accordingly, I dissent.

I.

The Medicare Act is a part of the Social Security Act that establishes a federally subsidized health insurance program for elderly and certain disabled persons. (42 U.S.C. § 1395 et seq.) In the year 2000, the program provided health insurance coverage for 39 million persons, or one in seven Americans, and paid benefits in the total amount of approximately $217 billion. (The Henry J. Kaiser Family Foundation, Medicare at a Glance (Feb. 2001) p. 1.)

To ensure the orderly and efficient functioning of this enormous federal program, Congress has entrusted its administration to the Secretary of Health

and Human Services (the Secretary), who manages the program through the Health Care Financing Administration (HCFA). Pursuant to congressional authorization, the Secretary has established an extensive set of regulations to govern the program. (42 U.S.C. § 1395hh.)

Briefly, the Medicare system works like this. Eligible patients may obtain Medicare benefits in two ways. Where a patient elects to receive health care on a fee-for-service basis, the patient first consults with a physician and receives the recommended health services. The health care provider submits the bill for payment to a Medicare fiscal intermediary, typically a private company that has contracted with the Secretary to act as an adjuster. The intermediary then determines whether the services in question are covered by Medicare and the amount due for the services. (See *Bodimetric Health Services v. Aetna Life & Cas.* (7th Cir. 1990) 903 F.2d 480, 482 & fn. 3 (*Bodimetric*).) Alternatively, an eligible patient may elect to receive Medicare benefits through enrollment with an HMO that has contracted with the Secretary through HCFA to be reimbursed for services rendered to enrollees. In such situations, the patient receives treatment either from the HMO's own physicians or from physicians who have contracted with the HMO, as in the case of defendant PacifiCare of California, Inc. (PacifiCare), here. When HCFA contracts with an HMO, there is no separate fiscal intermediary and the HMO makes an "organization determination" (an initial determination) whether health services requested on behalf of an enrollee are covered under Medicare and whether they should be furnished, arranged for, or reimbursed. (42 C.F.R. § 417.606 (2000).)

Health services covered under Medicare, whether or not provided through an HMO, are subject to the following important limitation: "Notwithstanding any other provision of this subchapter, no payment may be made under part A or part B of this subchapter for any expenses incurred for items or services— [¶] . . . which . . . are not *reasonable and necessary* for the diagnosis or treatment of illness or injury . . . ."[1] (42 U.S.C. § 1395y(a)(1)(A), italics added; see *Roen v. Sullivan* (D.Minn. 1991) 764 F.Supp. 555, 557.) Thus, if an HMO plan enrollee requests a health service that is not medically reasonable and necessary, the enrollee generally is not entitled to the benefit and the HMO is not obligated to provide for it.

Under the Act, an individual's entitlement to Medicare benefits must be determined in the manner provided for by the Secretary: "The determination

---

[1]Part A of Medicare is a mandatory hospital insurance program covering the cost of hospitalization and related expenses. (42 U.S.C. § 1395c et seq.) Part B establishes a voluntary supplemental medical insurance program covering specified medical services, devices, and equipment. (*Id.*, § 1395j et seq.)

of whether an individual is entitled to benefits . . . , and the determination of the amount of benefits . . . , and any other determination with respect to a claim for benefits . . . shall be made by the Secretary in accordance with regulations prescribed by him." (42 U.S.C. § 1395ff(a).) The Secretary is authorized to impose, in addition to "any other remedies authorized by law," civil monetary penalties and to suspend payment to or enrollment of a contracting HMO or fiscal intermediary where, among other things, such an organization "fails substantially to provide medically necessary items and services that are required (under law or under the contract) to be provided to an individual covered under the contract, if the failure has adversely affected (or has substantial likelihood of adversely affecting) the individual" (42 U.S.C. § 1395mm(i)(6)(A)(i)) or "misrepresents or falsifies information that is furnished— [¶] . . . to the Secretary . . . or— [¶] . . . to an individual" (*id.*, § 1395mm(i)(6)(A)(v)). (See also 42 C.F.R. § 417.500 (2000).)

Integral to the Medicare scheme is a thorough administrative review process for an individual "dissatisfied with a determination regarding his or her Medicare benefits." (42 C.F.R. § 417.600(a)(1) (2000); see *id.*, § 417.600 et seq.; 42 U.S.C. § 1395ff(b)(1).) Judicial review of claims arising under the Medicare Act is available only in federal court, and only then if the amount in controversy is at least $1000 and the Secretary has rendered a "final decision" on the claim, in the same manner as is provided for old age and disability claims arising under title II of the Social Security Act. (42 U.S.C. §§ 405(g), (h), 1395ff(b)(1)(C).)

Pursuant to rulemaking authority granted by Congress, the Secretary has provided that a final decision is rendered on a Medicare claim only after the individual claimant has presented the claim through all designated levels of administrative review, including review by HCFA or its agent, an administrative law judge (ALJ), and the departmental appeals board. (*Heckler v. Ringer* (1984) 466 U.S. 602, 606-607 [104 S.Ct. 2013, 2017-2018, 80 L.Ed.2d 622] (*Ringer*); 42 C.F.R. § 417.600 et seq.) Portions of the administrative review process must be expedited where the usual time frames "could seriously jeopardize the life or health of the enrollee or the enrollee's ability to regain maximum function." (42 C.F.R. §§ 417.609(b), 417.617(b) (2000).) As the legislative history explains, "[i]t is intended that the remedies provided by these review procedures shall be *exclusive*." (Sen.Rep. No. 404, 89th Cong., 1st Sess. (1965), reprinted in 1965 U.S. Code Cong. & Admin. News, pp. 1943, 1995, italics added.)

The broad scope of Medicare's exclusive review process was emphasized in *Ringer, supra*, 466 U.S. 602, the United States Supreme Court's seminal decision on the issue. In *Ringer*, four individual Medicare beneficiaries filed

a federal court action for declaratory and injunctive relief that challenged the Secretary's formal policy of denying Medicare coverage for a surgical procedure known as bilateral carotid body resection (BCBR). Three of the plaintiffs had undergone BCBR surgery but were denied reimbursement for the surgery by fiscal intermediaries. Although some of the levels of the administrative review process had been completed, none of the three had received a final decision on their benefit claims from the Secretary. (466 U.S. at pp. 609-610 [104 S.Ct. at pp. 2018-2019].) The fourth plaintiff, who did not have the surgery because he could not afford it, had not submitted a claim for reimbursement. (*Id.* at p. 610 [104 S.Ct. at p. 2019].) The four plaintiffs contended in federal court that the Secretary had a constitutional and statutory obligation to provide payment for BCBR surgery and that the Secretary's formal ruling refusing to find the BCBR surgery "reasonable and necessary" under the Act was unlawful. (*Ringer, supra,* 466 U.S. at pp. 610-611 [104 S.Ct. at p. 2019].)

In *Ringer,* the Supreme Court considered whether the plaintiffs, who were not seeking an award of benefits, could bring an action directly in federal court without pursuing administrative remedies. In analyzing the issue, the court initially observed that judicial review is unavailable for " 'claim[s] arising under' " the Medicare Act, and that claims arise under Medicare if they are " 'inextricably intertwined' " with claims for Medicare benefits. (*Ringer, supra,* 466 U.S. at pp. 614-615 [104 S.Ct. at p. 2021].) Noting that the phrase "claim arising under" had been judicially construed "quite broadly," the high court concluded that a claim arises under Medicare where " 'both the standing and the substantive basis for the presentation' " of the claim is the Medicare Act. (*Ringer, supra,* 466 U.S. at p. 615 [104 S.Ct. at p. 2022].)

Turning to the facts of the case, the Supreme Court first noted that the Secretary's formal ruling was inapplicable to the claims of the first three plaintiffs due to timing. But their claims, which did not seek an actual award of benefits, nonetheless "[arose] under" the Medicare Act because the Act furnished both the standing and the substantive basis for their claims. (*Ringer, supra,* 466 U.S. at p. 615 [104 S.Ct. at p. 2021].) As for the fourth plaintiff, whose claim was in fact subject to the Secretary's ruling, the Supreme Court viewed him as clearly seeking "to establish a right to future payments should he ultimately decide to proceed with BCBR surgery." (*Id.* at p. 621 [104 S.Ct. at p. 2025].) That the fourth plaintiff was not seeking the immediate payment of benefits was of no importance; his claim "must be construed as a 'claim arising under' the Medicare Act," the court reasoned, "because any other construction would allow claimants substantially to undercut Congress' carefully crafted scheme for administering the Medicare

Act. [¶] If we allow claimants . . . to challenge in federal court the Secretary's determination . . . that BCBR surgery is not a covered service, we would be inviting them to bypass the exhaustion requirements of the Medicare Act by simply bringing declaratory judgment actions in federal court before they undergo the medical procedure in question." (*Ibid.*) As part of its analysis, the court found that the administrative review process provided an adequate remedy for challenging both the Secretary's decision that a particular medical service was not reasonable and necessary, and the means by which the Secretary implemented such a decision. (*Id.* at p. 617 [104 S.Ct. at p. 2023].)

In holding that a claim may arise under Medicare while also arising under some other law (i.e., the federal Constitution), the *Ringer* decision looked to *Weinberger v. Salfi* (1975) 422 U.S. 749 [95 S.Ct. 2457, 45 L.Ed.2d 522] (*Salfi*), for guidance. (*Ringer, supra,* 466 U.S. at p. 615 [104 S.Ct. at pp. 2021-2022].) In *Salfi*, a claimant who had been denied Social Security benefits based on "duration-of-relationship" requirements of the Social Security Act filed an action in federal court on behalf of herself, and others similarly situated, challenging the constitutionality of the statutory requirements.[2] In response to the claimant's argument that the action arose under the Constitution and not under the Social Security Act, the high court stated: "It would, of course, be fruitless to contend that appellees' claim is one which does not arise under the Constitution, since their constitutional arguments are critical to their complaint. But it is just as fruitless to argue that this action does not also arise under the Social Security Act. For not only is it Social Security benefits which appellees seek to recover, but it is the Social Security Act which provides both the standing and the substantive basis for the presentation of their constitutional contentions." (*Salfi, supra,* 422 U.S. at pp. 760-761 [95 S.Ct. at p. 2464].) The Supreme Court ultimately concluded in *Salfi* that compliance with the administrative review process was required, even though the claims had a constitutional basis and even though the Secretary had no power to affect an unconstitutional denial of benefits. (*Salfi, supra,* 422 U.S. at p. 764 [95 S.Ct. at p. 2466].)

Taken together, *Ringer* and *Salfi* make clear that claims challenging an HMO's denial of reasonable and necessary health services covered by Medicare must undergo an administrative review for a final decision prior to any judicial review to ensure Medicare's efficient and orderly functioning. As the Supreme Court emphasized in both decisions, "the purpose of the exhaustion requirement is to prevent 'premature interference with agency

---

[2]Claims seeking payment of ordinary Social Security benefits are subject to the same administrative exhaustion provisions as those seeking Medicare benefits. (Maj. opn., *ante*, at p. 418.)

processes' and to give the agency a chance 'to compile a record which is adequate for judicial review.' " (*Ringer, supra,* 466 U.S. at p. 619, fn. 12, quoting *Salfi, supra,* 422 U.S. at p. 765.) That purpose is frustrated substantially when HMO plan enrollees are permitted to bypass the administrative process. As one court aptly summarized, "[t]he lack of a developed record means that plaintiffs in effect call upon the court to play doctor in their cases. The prescribed HMO and agency decisionmaking procedures were designed to avoid that problem." (*Roen v. Sullivan, supra,* 764 F.Supp. at pp. 560-561.)

In California, *Ringer's* analysis was followed in *Redmond v. Secure Horizons, Pacificare, Inc.* (1997) 60 Cal.App.4th 96 [70 Cal.Rptr.2d 174] (*Redmond*). In that case, a Medicare HMO plan enrollee underwent a "lifesaving" surgery after the HMO initially denied coverage. The enrollee subsequently requested reimbursement for the surgery and the HMO ultimately acquiesced. The enrollee then sued the HMO in state court for breach of contract, breach of the implied covenant of good faith and fair dealing, and negligent and intentional infliction of emotional distress. The HMO demurred, contending that the tort and contract causes of action were inextricably intertwined with the denial of Medicare benefits and were therefore subject to Medicare's administrative procedures.

On review, the Court of Appeal ruled in favor of the HMO: "[W]hile plaintiff's causes of action are not actually a claim for benefits, since she has already obtained reimbursement of her medical expenses, her causes of action *are* 'inextricably intertwined' with a claim that she was entitled to the reimbursement she received. Plaintiff argues that her complaint was not based on her entitlement to benefits but on defendant's 'conduct' with respect to her claim for benefits. This argument fails because the alleged wrongfulness of defendant's conduct depends on whether plaintiff was entitled to payment of her claim." (*Redmond, supra,* 60 Cal.App.4th at p. 102; accord, *Wilson v. Chestnut Hill Healthcare* (E.D.Pa., Feb. 22, 2000, Civ. A. No. 99-CV-1468) 2000 WL 204368, at p. *4 ["courts must discount any 'creative pleading' which may transform Medicare disputes into mere state law claims, and painstakingly determine whether such claims are ultimately Medicare disputes"].)

Additionally, federal decisions arising in analogous contexts have followed *Ringer* in foreclosing state law claims by health care providers pertaining to the withholding of Medicare benefit reimbursements.[3] For example, in *Bodimetric, supra,* 903 F.2d 480, a provider filed suit against a

---

[3]*The United States Supreme Court subsequently invoked Ringer in a decision holding that* damage claims arising from decisions concerning payment of ordinary Social Security

Medicare fiscal intermediary, alleging state law claims for fraud and for wrongful misconduct in the processing of its reimbursement claims. Although the action sought recovery of tort damages, not benefit reimbursements, the Seventh Circuit Court of Appeals concluded that the plaintiff could not avoid the Medicare Act's review process "simply by styling its attack as a claim for collateral damages instead of a challenge to the underlying denial of benefits." (*Bodimetric*, at p. 487.) While recognizing that the federal administrative process might not afford the provider all the relief it sought pursuant to its state law claims, the appeals court nonetheless emphasized that "Congress, through its establishment of a limited review process, has provided the remedies it deems necessary to effectuate the Medicare claims process." (*Id.* at p. 486, fn. 5; see also *Marin v. HEW, Health Care Financing* (9th Cir. 1985) 769 F.2d 590.)

Similarly, in *Midland Psychiatric Associates, Inc. v. U.S.* (8th Cir. 1998) 145 F.3d 1000 (*Midland*), a health care provider sued a Medicare fiscal intermediary for tortiously interfering with its contracts with hospitals by denying the hospitals' payment claims for services rendered by the provider to Medicare beneficiaries. In affirming dismissal of the provider's action, the Eighth Circuit Court of Appeals reasoned that the intermediary could not be held liable for tortious interference if it had a right to deny the hospitals' payment claims and that hearing the tortious interference claim would mean reviewing the merits of the intermediary's Medicare claims decisions. (*Midland*, at pp. 1002, 1004.) Relying on *Ringer* and *Salfi*, the Eighth Circuit concluded that the tortious interference claim arose under the Medicare Act and was therefore subject to the exclusive federal administrative review procedures, even though, as pleaded, the claim also arose under state law.[4] (*Midland*, at p. 1004; see also *Jamaica Hosp. Nursing Home v. Oxford Health*

benefits are foreclosed by the Secretary's exclusive administrative jurisdiction over such decisions. In *Schweiker v. Chilicky* (1988) 487 U.S. 412 [108 S.Ct. 2460, 101 L.Ed.2d 370], claimants whose Social Security disability benefits were improperly terminated during disability reviews but were later restored, sued federal and state program administrators for alleged violations of their Fifth Amendment right to due process, and sought recovery of damages for emotional distress and for loss of food, shelter, and other necessities proximately caused by the denial of benefits without due process. In that case, the high court determined that since the harm resulting from the alleged constitutional violation was inseparable from that resulting from the denial of benefits, both claims were remediable, if at all, only through the federal administrative review process. (487 U.S. at pp. 428-429 [108 S.Ct. at pp. 2470-2471].)

[4]In a footnote, the majority expresses awareness of *Bodimetric*, *supra*, 903 F.2d 480, *Midland*, *supra*, 145 F.3d 1000, and *Marin v. HEW, Health Care Financing*, *supra*, 769 F.2d 590. (Maj. opn., *ante*, at p. 426, fn. 11.) The majority does not dispute those courts' conclusions that claims "arising under" the Medicare Act, as that phrase was defined in *Ringer*, *supra*, 466 U.S. 602, may encompass state law claims seeking tort damages for harm allegedly sustained as a result of improper denial of claims. (Maj. opn., *ante*, at p. 426, fn. 11.) Rather, the majority attempts to distinguish the instant case on the basis that it involves

*Plans* (S.D.N.Y., Sept. 26, 2000, No. 99 Civ. 9541 (AGS)) 2000 WL 1404930 [where nursing home alleged that an assignment of insurance rights from a treated patient entitled it to payment from an HMO for the cost of treatment, claim arose under the Medicare Act even though it was presented as a contract claim].)

## II.

Under the foregoing authorities, it is evident that what plaintiffs have asserted in this action are "claims arising under" the Medicare Act. Specifically, plaintiffs allege that (1) PacifiCare breached its duty to comply with state and Medicare regulations governing the provision of health care services and failed to secure for plaintiff George McCall "reasonably necessary" health care services to which he was entitled (negligence, willful misconduct, unfair business practices); (2) PacifiCare misrepresented to government officials and to its own enrollees that it would comport with California Health and Safety Code provisions and with Medicare regulations, yet failed to do so after having secured HMO licensure through the state and an HMO contract through HCFA, and after having induced enrollment by individuals entitled to Medicare benefits (fraud, constructive fraud, unfair business practices); and (3) PacifiCare wrongfully denied plaintiff George McCall the level of health services to which he was entitled under both state law and Medicare by refusing surgical intervention to save his life (a lung transplant) and instead providing a much less expensive course of treatment (intentional and negligent infliction of emotional distress, unfair business practices).

At bottom, plaintiffs challenge PacifiCare's failure to furnish or arrange for "reasonable and necessary" health services covered by Medicare. (42 U.S.C. § 1395y(a)(1)(A).) Critically, plaintiffs' ability to prevail on their state law causes of action inevitably turns upon a determination that plaintiff George McCall was entitled to a Medicare benefit, i.e., a lung transplant, and that PacifiCare had no right to deny such benefit because it was reasonable and necessary for treatment of his condition. (See *Ringer, supra,* 466 U.S. at pp. 610-611 [104 S.Ct. at pp. 2019-2020]; *Redmond, supra,* 60 Cal.App.4th at p. 102.) The consequential damages sought by plaintiffs also are dependent upon such a determination. That being the case, plaintiffs' claims are

"claims arising from violations of duties separate from the duty to pay Medicare benefits." (*Ibid.*) Contrary to the majority's suggestion, and as I explain in part II, *post,* plaintiffs here similarly seek tort damages arising from the alleged improper denial of a benefit, i.e., a lung transplant, to which plaintiffs claim entitlement under Medicare. Although the complaint also alleges violations of "duties" that purport to extend beyond PacifiCare's alleged duty to pay Medicare benefits, the harm supposedly resulting from those violations appears inseparable from the harm resulting from PacifiCare's denial of the lung transplant. (See pt. II, *post.*)

"inextricably intertwined" with a Medicare benefits determination and are subject to Medicare's administrative review process.

As *Ringer* instructs, it matters not that plaintiffs carefully avoid any formal claim for reimbursement of sums they expended to obtain the services otherwise covered under Medicare. (*Ringer, supra,* 466 U.S. at p. 621 [104 S.Ct. at pp. 2024-2025].) Nor does it make a difference that plaintiffs' claims are based in part on state law, for it is the Medicare Act that furnishes both the standing and the substantive basis for the presentation of their state law contentions. (See *Ringer,* at p. 620 [104 S.Ct. at p. 2024]; *Salfi, supra,* 422 U.S. at pp. 760-761 [95 S.Ct. at pp. 2464-2465].) Distilled to their essence, the state law causes of action necessarily rely upon plaintiff George McCall's status as an individual entitled to Medicare benefits and upon the Medicare Act itself to define the benefits and health services to which he was legally entitled but wrongly denied. Consequently, such claims do not, as the majority suggests, only "incidentally" refer to a denial of benefits under Medicare. (See maj. opn., *ante,* at p. 425.)

The Supreme Court, I note, has suggested that an exception to exhaustion may arise when a claim is "wholly 'collateral' to [a] claim for benefits," but that such exception will not apply where there is "no colorable claim that an erroneous denial of . . . benefits in the early stages of the administrative process will injure [the claimant] in a way that cannot be remedied by the later payment of benefits." (*Ringer, supra,* 466 U.S. at p. 618 [104 S.Ct. at p. 2023].) As discussed, however, plaintiffs' state law claims are not wholly collateral to a claim for benefits because, at bottom, they ultimately derive from the contention that plaintiff George McCall was entitled to a lung transplant and other reasonable and necessary medical services denied him by PacifiCare. Moreover, nothing in the record (limited as it may be) suggests plaintiffs could not have overcome PacifiCare's denial of such services through the administrative process if in fact Medicare coverage existed. Indeed, had George McCall initially elected to receive health care on a fee-for-service basis and consulted a physician of his choice for purposes of receiving a lung transplant, and had he been denied reimbursement for the physician's services by a Medicare fiscal intermediary, there would be no question that he would have been required to seek reconsideration of the denial through Medicare's administrative review process. The fact that a Medicare HMO denied his request for a transplant in a managed care setting should make no difference in the legal analysis.

At oral argument on this matter, counsel for plaintiffs could not and did not dispute that the claims concerning PacifiCare's alleged wrongful refusal to arrange for a lung transplant would necessitate a determination whether

the transplant was a reasonable and necessary medical treatment to which plaintiff George McCall was entitled under Medicare. Counsel instead argued, and the majority evidently agrees, that no benefit determination would be involved in deciding whether PacifiCare fraudulently induced plaintiff to enroll in PacifiCare, whether PacifiCare wrongfully withheld information regarding treatment options, and whether PacifiCare wrongfully forced plaintiff to disenroll from PacifiCare.

That argument fails to convince. Essentially all of plaintiffs' claims are predicated on the central theory that PacifiCare, as a Medicare HMO, was required to comply with all Medicare rules and regulations, that reasonable and necessary health services covered by Medicare would not be denied, and that all available Medicare treatment options would be discussed and provided. As a result of PacifiCare's alleged misconduct, plaintiff George McCall enrolled in PacifiCare and allegedly was harmed thereby. Moreover, to the extent plaintiffs allege that PacifiCare made fraudulent misrepresentations to Medicare in order to obtain a Medicare HMO contract and to induce enrollment, such claims are, as plaintiffs apparently recognize, barred under the reasoning of *Buckman Co. v. Plaintiffs' Legal Committee* (2001) 531 U.S. 341 [121 S.Ct. 1012, 148 L.Ed.2d 854] (finding similar fraud claims preempted by the Federal Food, Drug, and Cosmetic Act, as amended by the Medical Device Amendments of 1976). As for the disenrollment claim, plaintiff George McCall allegedly had to disenroll in order to get the lung transplant he sought. Since the harm resulting from all of PacifiCare's alleged misconduct is inseparable from the harm resulting from its denial of the lung transplant, there appears no basis for finding any of the claims exempt from the administrative review process.

In purporting to analyze plaintiffs' complaint, the majority suggests that malpractice may be committed under state law based on a provider's failure to properly advise of treatment options or its failure to provide appropriate referrals to specialists, whether or not such options or referrals were covered by Medicare, and that malpractice as such may prevent a beneficiary from seeking noncovered services at his own expense. (Maj. opn., *ante,* at p. 425.) This sort of malpractice claim, the majority asserts, would not implicate a coverage determination or fall within the scope of the Medicare review process.

Even assuming the majority states the law correctly in the abstract, the complaint here lacks such a claim. The allegations make no specific reference to any "noncovered" medical treatment about which plaintiff George McCall should have been advised. Nor do they suggest that plaintiff would have undergone a particular noncovered treatment at his own expense but for

PacifiCare's alleged misconduct, or that any harm flowed from his ignorance of noncovered treatments. Rather, the crux of the complaint is that plaintiff was harmed by PacifiCare's failure to secure the lung transplant and other reasonable and necessary medical treatment to which he was entitled under Medicare.

To support its contrary conclusion, the majority invokes the Ninth Circuit Court of Appeals' decision in *Ardary v. Aetna Health Plans of California, Inc.* (9th Cir. 1996) 98 F.3d 496 (*Ardary*). In *Ardary*, the heirs of a deceased Medicare beneficiary brought state law claims for wrongful death against a private Medicare provider seeking compensatory and punitive damages on the basis that the provider improperly denied medical services (an emergency airlift transfer) and misrepresented its managed care plan to the beneficiary. The provider removed the action to federal court, arguing, among other things, that relief was limited to federal administrative remedies under *Ringer*. The Ninth Circuit disagreed.

Notably, the Ninth Circuit acknowledged that the heirs' state law claims were all predicated on the provider's failure to authorize the emergency airlift transfer. (*Ardary, supra,* 98 F.3d at p. 498.) Yet the court determined their complaint did not arise under the Medicare Act because it did not " 'include any claims in which "*both* the standing and the substantive basis for the presentation" of the claims' is the Act." (*Ardary,* at p. 499.) In its view, standing for the heirs' claims was provided by state common law (e.g., negligence, infliction of emotional distress, misrepresentation, and professional negligence), not the Act. (*Id.* at pp. 499-500.) The court also concluded the claims were not "inextricably intertwined" with a benefits claim because the heirs were not seeking to recover benefits. (*Id.* at p. 500.) Finally, the court emphasized the inappropriateness of relegating the wrongful death claims to the administrative process because the injury complained of—the beneficiary's death—could not be remedied by the retroactive authorization or payment of the airlift transfer. (*Ibid.*)

*Ardary* is analytically flawed and cannot support the majority's disregard of the principles articulated by the Supreme Court in *Ringer* and *Salfi.* Contrary to *Ardary*'s reasoning, those decisions affirm that claims may arise under the Medicare Act and be subject to its administrative review process, *even though the claims also arise under some other law.* Thus, even where claims have a state law basis, as exemplified in *Ardary* and in the instant case, they also arise under the Medicare Act where, at bottom, they challenge the correctness of the defendant's denial of health services covered by Medicare. (See *Ringer, supra,* 466 U.S. at p. 615 [104 S.Ct. at pp. 2021-2022]; *Redmond, supra,* 60 Cal.App.4th at p. 102; *Wilson v. Chestnut Hill*

*Healthcare, supra,* 2000 WL 204368, at p. *4; see also *Salfi, supra,* 422 U.S. at pp. 760-761 [95 S.Ct. at pp. 2464-2465]; *Midland, supra,* 145 F.3d 1000; *Bodimetric, supra,* 903 F.2d 480.) Moreover, the high court firmly rejected the notion that the absence of a formal request for payment of benefits is controlling. (*Ringer, supra,* 466 U.S. at p. 621 [104 S.Ct. at pp. 2024-2025].) In any event, the result in *Ardary* was largely influenced by the fact that it was a wrongful death action brought by the heirs of a Medicare beneficiary. (*Ardary, supra,* 98 F.3d at p. 500.) Here, of course, the action was brought by the Medicare beneficiary himself and contains no wrongful death component.

The majority also supports its holding with the observation that the Secretary has no authority to assess the validity or merit of plaintiffs' tort claims or to grant relief for such claims. (Maj. opn., *ante,* at pp. 421-422, fn. 7, citing *Kelly v. Advantage Health, Inc.* (E.D.La., May 11, 1999, Civ. A. No. 99-0362) 1999 WL 294796.) The Secretary, however, is authorized to impose civil monetary penalties and to suspend payment to or enrollment of a contracting HMO if the HMO "fails substantially to provide medically necessary items and services that are required" to be provided to an individual covered under the contract, where "the failure has adversely affected (or has substantial likelihood of adversely affecting) the individual." (42 U.S.C. § 1395mm(i)(6)(A)(i); see also 42 C.F.R. § 417.500 (2000).) The Secretary may also impose such penalties if the HMO "[m]isrepresents or falsifies information that is furnished" to the Secretary or to an individual. (42 C.F.R. § 417.500(a)(5) (2000).) Accordingly, it appears the Secretary has been amply armed by Congress to address the type of wrongdoing alleged here.

More to the point, Congress has determined that questions regarding a claimant's entitlement to benefits under the Medicare Act must be decided through Medicare's administrative process to ensure the efficient and even administration of the federally insured program. An individual who is "dissatisfied with [an HMO's] determination regarding his or her Medicare benefits" (42 C.F.R. § 417.600(a)) should not be permitted "to undercut Congress's carefully crafted scheme for administering the Medicare Act" (*Ringer, supra,* 466 U.S. at p. 621 [104 S.Ct. at p. 2025]) by making state law contentions that necessitate a state court's review of an HMO's decision to deny benefits covered by Medicare. Where, as here, such contentions are central to a plaintiff's claims for recovery, they remain properly subject to the Act's mandatory administrative process where they may receive a thorough and expedited review. (See *Ringer, supra,* 466 U.S. at p. 619 & fn. 12 [104 S.Ct. at p. 2024]; see also *Salfi, supra,* 422 U.S. at p. 765 [95 S.Ct. at pp. 2466-2467]; *Redmond, supra,* 60 Cal.App.4th at p. 102; *Wilson v. Chestnut Hill Healthcare, supra,* 2000 WL 204368, at pp. *3, *6.)

The majority also justifies its decision by invoking the general presumption that Congress, in enacting laws, does not intend to preempt state regulation of the same subject matter unless a contrary intent appears, and by relying on title 42, section 1395 of the United States Code,[5] and on the Medicare Act's requirement that HMO's and other Medicare providers be state licensed (42 U.S.C. § 1395mm(b)). (Maj. opn., *ante*, at pp. 422-424.)

It is inconceivable that Congress did not intend to oust state courts of jurisdiction to review the merits of an HMO's denial of Medicare benefits. Not only are the provisions of the Act crystal clear on the point (42 U.S.C. §§ 1395ff(a), (b)(1), 405(g), (h)), but the legislative history expressly indicates that the remedies provided by the administrative review procedures are intended to be *exclusive*. (Sen.Rep. No. 404, 89th Cong., 1st Sess., *supra*, reprinted in 1965 U.S. Code Cong. & Admin. News, pp. 1943, 1995.) The legislative declaration codified at title 42, section 1395 of the United States Code (*ante*, fn. 5) and the state license requirement (42 U.S.C. § 1395mm(b)) offer no support for a contrary inference.

Nor is the majority's holding supported by the Balanced Budget Act of 1997 (the BBA), which added a provision to the Medicare Act expressly preempting state standards relating to benefit requirements, coverage determinations, and requirements relating to the inclusion or treatment of providers. (42 U.S.C. § 1395w-21 et seq.) As the HCFA comments quoted by the majority explain (maj. opn., *ante*, at pp. 422-424), even though the Medicare Act did not previously contain an express preemption clause, preemption of state laws and standards was proper "based on general constitutional Federal preemption principles." (63 Fed.Reg. 35012 (June 26, 1998).) The quoted comments also clarify the following: that while a claim regarding a Medicare + Choice[6] organization's "denial of care that a beneficiary believes to be covered care is subject to the Medicare appeals process," "the matter may also be the subject of a tort case under State law if medical malpractice is alleged, or of a state contract law claim if an enrollee alleges that the [Medicare + Choice] organization has obligated itself to provide a particular service under State law without regard to whether it is covered under its [Medicare + Choice] contract." (63 Fed.Reg., *supra*, p. 35013.)

Contrary to the majority's assertion, HCFA's comments do not "strongly imply that state law claims such as those involved in the present case were

---

[5]That section provides: "Nothing in this subchapter shall be construed to authorize any Federal officer or employee to exercise any supervision or control over the practice of medicine or the manner in which medical services are provided, or over the selection, tenure, or compensation of any officer or employee of any institution, agency, or person providing health services; or to exercise any supervision or control over the administration or operation of any such institution, agency, or person." (42 U.S.C. § 1395.)

[6]HMO's contracting with Medicare, such as PacifiCare here, automatically became Medicare + Choice plans effective January 1, 1999. (See 42 U.S.C. § 1395mm(k).)

not preempted under then applicable law." (Maj. opn., *ante*, at p. 424.) If anything, both the comments and the BBA itself settle any doubt regarding Medicare's preemptive scope over claims that essentially rely on state standards and requirements to establish coverage of benefits. Indeed, as HCFA elucidates, "[s]tate laws requiring, for example, a second opinion from non-contracted physicians" would be superseded by the BBA preemptions "because these requirements in essence mandate the 'benefit' of access to a particular provider's services even where the services of that provider would not otherwise be a covered benefit." (63 Fed.Reg., *supra*, p. 35013.) Although HCFA further explains that preemption does not extend to all medical malpractice and contract claims, that has always been the case where the claims were not inextricably intertwined with a benefits determination. As discussed, however, the claims asserted here do not fall within those long acknowledged categories of exempted claims.

## III.

The Medicare Act represents a "carefully crafted scheme" for administering a massive federally insured program (*Ringer*, *supra*, 466 U.S. at p. 621 [104 S.Ct. at p. 2025]). Central to that scheme is Congress's determination that administrative remedies, followed by federal court review if necessary, are appropriate to fully and consistently address the claims of those who seek to challenge an HMO's benefits decision, and that administrative sanctions are appropriate to address certain misconduct by errant HMO's. While the system may not afford the range of relief available under state law, it is designed to provide that coverage decisions are reviewed in a thorough and expeditious manner by HCFA or its agent, and by ALJ's and departmental review boards that have special expertise in such matters. It is not the prerogative of this court to second-guess the measured trade-offs enacted by Congress.

Today's decision all but assures that Medicare's administrative review process will cease to function as a meaningful limit on judicial review. I cannot, and will not, join in its undoing.

Brown, J., concurred.